No. 13,292.

Associated Oil Company of Wyoming *v*. Rector et al.

(50 P. [2d] 551)

Decided September 30, 1935.   Rehearing denied October 21, 1935.

Mr. John R. Clark, for plaintiff in error.

Mr. Frank Delaney, for defendants in error.

*In Department.*

Mr. Justice Hilliard delivered the opinion of the court.

June 11, 1918, the defendants in error, who were defendants below, executed to a remote assignee of the plaintiff in error, which was plaintiff below, their promissory note for $25,000, payable on or before three years, with interest at six per cent per annum, payable semi-annually. To secure this note they gave a deed of trust on their lands in Rio Blanco county to the public trustee. This deed was in the usual form of such instruments excepting for a provision giving the grantors the right to the release of 80-acre parcels by payment of $5,000 on any interest paying date, and contained this clause: "This deed of trust is subject to a certain Oil Lease bearing date June 28, 1916, made by the grantors of W. J. Luke, Jr." The oil lease referred to was between the same parties, that is, the Rectors and Luke, and by assignments became the property of the plaintiff. July 24, 1929, the plaintiff brought this action to foreclose the trust deed as a mortgage, alleging that the note was past due since August 1, 1928.

The defendants answered averring the note was not due, and by way of cross-complaint alleged that sums aggregating more than $10,000 were due them from the plaintiff. They also sought reformation of the deed of trust in two particulars, first, that with respect to the accompanying water rights it be reformed to permit partial release of the same upon partial releases of the land; and, second, that with respect to the oil and gas rights it be reformed to show that the clause making the deed of trust subject to the oil and gas lease to Luke actually excepted all oil and gas rights from the conveyance. The prayer of the defendants was that the complaint be dismissed; that the $10,000 claimed by them be considered as partial payment and 160 acres of the land, designated by them, be released from the deed of trust;

that the deed of trust be reformed in the particulars mentioned, and that proportionate parts of the water rights be also released. The court found all of the issues in favor of the defendants, held the note was not due, reformed the deed of trust as prayed, and ordered the release of the 160 acres designated by the defendants and a proportionate part of the water rights.

The lands of the defendants are located in what is called the Rangely oil field. In 1918 Luke sought to lease these lands for the purpose of exploring the possibility of production therefrom of oil and gas, entered into negotiations with the defendants, and a lease was made. As a part of the consideration for the lease it was agreed that a loan of $25,000, to be secured as is set forth above, should be made by him to defendants, and this was done. The gist of the controversy, omitting for the time reference to the reformations sought, is whether the note is due, and this can only be determined by examination of the lease of June 28, 1918, and the subsequent written extensions and modifications of its provisions for, as will be seen, the due date of the note was from time to time extended by the agreements of the parties concerning the oil and gas lease. The lease of June 28, 1918, omitting description of the land, reads as follows.

"This lease and agreement, made and entered into this 28th day of June, A. D. 1918, by and between James W. Rector and Rosa M. Rector, his wife, of the County of Mesa and State of Colorado, parties of first part, hereinafter designated the lessors, and W. J. Luke, Jr., of the County of Fresno and State of California, party of the second part, hereinafter designated the lessee, witnesseth:

"That for and in consideration of the sum of ten dollars ($10.00) to the lessors in hand paid by the lessee, the receipt whereof is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of the respective parties hereto to be performed,

the parties do hereby covenant and agree as follows, to-wit:

## I.

"The lessors do, by these presents, hereby lease unto the said lessee all those certain tracts of land situate in the County of Rio Blanco and State of Colorado and described as follows, to-wit: * * *.

"Containing 840 acres, more or less, for the term of twenty (20) years commencing on the 11th day of July, 1918, for the purposes and with the exclusive right of exploring, drilling, boring, developing and operating said tracts of land for petroleum, oil, gas and other hydro-carbon substances, and to remove said substances therefrom, together with the right to lay pipe lines, telephone and telegraph lines and electric light and power transmission lines, and to construct roads and erect the necessary buildings and other structures, plants, machinery, facilities, and equipment for such exploration, drilling, boring, development and operation and for storing, removing, transporting, refining, treating, handling and disposing of the products of said land, and if oil or gas is discovered on any of said tracts of land in paying quantities, to have and to hold the producing wells and five (5) acres of land surrounding each well so long after the expiration of said term of twenty years as oil or gas shall be produced in paying quantities therefrom, together with the right of ingress to and egress from each such five-acre tract, and also with all the incidents and appurtenances appertaining to the operation of said wells and the effectual handling and disposition of the products thereof. It is understood between the parties hereto that no new wells shall be sunk by said lessee after the expiration of said term of twenty years, but that any wells in process of drilling at the expiration of said term may be completed, and if oil or gas in paying quantities is discovered therein, the lessee shall have and hold the same so long after completion as oil or gas in paying quantities shall be produced therefrom,

with like rights as in the case of wells producing oil or gas in paying quantities at the expiration of said term of twenty years, also that the lessee shall have the right to redrill, ream out and deepen producing wells at any time. It is further understood and agreed between the parties hereto that any such five-acre tract surrounding any producing well shall be rectangular in form, the side of which shall be twice the length of the end lines.

"A well producing 25 barrels of oil per day for thirty consecutive days shall be deemed a well producing oil in paying quantities for the purpose of this lease, and a well producing 1,000,000 cubic feet of gas per day for thirty consecutive days shall be deemed a well producing gas in paying quantities for the purposes of this lease.

## II

"The lessee covenants and agrees to pay the lessors the sum of three hundred dollars ($300.00) per month, payable monthly in advance on the 11th day of each and every month commencing on the 11th day of July, 1918, until drilling operations shall have been commenced on the demised premises, or until the lessee shall relinquish the rights granted him by this lease.

"The lessors hereby covenant and agree that the lessee shall have one year from the 11th day of July, 1918, within which to begin drilling operations on the demised premises; if the lessee shall not begin to drill for oil on said premises on or before the 10th day of July, 1919, then this lease shall terminate at midnight on said last named day. It is understood between the parties hereto that it shall be entirely optional with the lessee whether or not he begins drilling operations upon said land within the said one year period, and that the monthly rental to be paid by the lessee to the lessors until the commencement of drilling operations or the relinquishment of the rights granted the lessee by this lease, is one of the considerations for said option, and that the only consequence of failure of the lessee to begin

drilling operations within said one-year period shall be the termination of this lease at the expiration of said one-year period, but this shall not relieve the lessee from paying any rent which may be due and payable.

"If the lessee shall actually and in good faith begin to drill for oil on the demised premises within said year, payment of said monthly rental shall cease upon the commencement of said operations, but this lease shall remain in full force and effect.

"If the lessee shall begin to drill for oil on the demised premises, then the lessee shall drill one well to such depth until the oil sands, if any, at the base of what is known as Mancos Shale are reached, or until oil in paying quantities, as in this lease defined, is discovered; provided, however, that the lessee shall in no event be obligated to drill to a depth exceeding 4000 feet, but may drill to a greater depth; and provided further that if the lessee shall conclude not to drill to a depth of 4000 feet, or until oil in paying quantities is found, he may at any time relinquish to the lessors the rights granted to him by this lease, and in the event of such relinquishment he shall not be liable to the lessors in any manner or for any sum whatsoever on account thereof.

"The well so to be drilled by the lessee shall be known as a test well, and it is understood between the parties hereto that the abandonment of any particular hole or holes commenced to be drilled shall not be deemed a cessation of drilling, provided a new hole is commenced to be drilled within a reasonable time thereafter, and that the lessee shall have full liberty to make as many experiments as in his judgment may appear necessary or desirable for the purpose of successfully bringing in a test well.

"If drilling operations shall be commenced by the lessee within said year, he shall continue such operations uninterruptedly unless prevented from so doing by strikes or other labor disturbances, by inability to procure materials or supplies, by failure or interruption

of transportation facilities, by accident, by fire, flood, the elements or act of God, by interference of civil or military authority, war or conditions resulting from war, any governmental action, or any cause whatsoever beyond the control of the lessee, and in the event of the interruption of drilling operations by any such causes, drilling shall be resumed as soon as practicable after such cause no longer exists, and if the lessee shall at any time cease drilling operations for a period exceeding thirty (30) consecutive days, unless prevented by any of said causes, and without necessity for such cessation in the practical conduct of the drilling operations, then during the period of cessation of drilling operations without cause the lessee shall pay to the lessors a rental for said premises at the rate of ten dollars ($10.00) per day, such number of days that operations were so suspended during the preceding calendar month; provided, however, that nothing herein contained shall prevent the lessee from ceasing drilling operations when the property is fully developed, or if he shall relinquish to the lessors the rights granted to him by this lease, and in the event of such cessation or relinquishment, no rent shall accrue after such cessation or relinquishment, and the lessee shall not be liable to the lessors in any manner or for any sums of money whatsoever.

"In the event that the lessee shall fail to pay any rent provided by this lease within thirty days after the same becomes due and payable hereunder, the lessors shall have the right, upon the expiration of said thirty days, to terminate this lease by giving to the lessee written notice of such termination, and by filing with the County Clerk and Recorder of said Rio Blanco County a duplicate of such notice.

"Any notice to the lessee under this lease shall be enclosed in an envelope addressed to the lessee at Room 808, Sharon Building, San Francisco, California, and deposited in the United States mail, postage thereon prepaid.

"Subject to the provisions herein contained the lessee shall have the sole right to determine the number of wells to be drilled and the depth to which the same shall be drilled, and the lessee may at any time abandon any well or wells, or may, if he so elects, relinquish the rights granted him by this lease as hereinabove provided.

"No well shall be drilled within 200 feet of the dwelling or any permanent building of the lessors on the demised premises without the prior written consent of the lessors.

"Upon abandonment of any well or wells, the lessee shall have the right to pull the casing and to remove all equipment, appliances and other improvements connected with or relating to said wells, upon the termination of this lease by expiration of the terms thereof, or upon any earlier termination of this lease, whether by relinquishment by the lessee of the rights granted him thereunder, or by notice of termination from the lessors by reason of any default on the part of the lessee, or otherwise, the lessee shall have the right, within a reasonable time after any such termination, to remove from the demised premises all buildings, structures, equipment, appliances and other improvements which he has placed or erected upon said land, and he shall have the right to pull casing but shall leave the surface of the ground in like condition as nearly as may be as it was prior to the laying of such lines. In case of the abandonment of any well, the lessee shall properly shut off the water so as to prevent infiltration thereof into the oil sands, if any, in said well. It is understood between the parties hereto that any relinquishment by the lessee of the rights granted him by this lease shall not be deemed a relinquishment of the right to remove the equipment, appliances and other improvements from the demised premises, but that all such rights of removal shall be reserved to the lessee.

"It is further understood between the parties hereto that in no event shall any rental whatever be payable by

the lessee at any time during which royalty is being paid to the lessors, as hereinafter provided.

### III

"The lessee shall conduct drilling operations on said land in such manner as to avoid, so far as may be practicable, damage to growing crops or improvements on said land, and if the lessee shall damage any growing crops or improvements, he shall make reasonable compensation therefor to the lessors.

"It is understood between the parties hereto that the lessors reserve the surface of the demised premises for all purposes other than those for which the demised premises are leased to the lessee, subject to the right of the lessee to use the same for the purposes of this lease.

### IV

"As a further consideration for this lease, the lessee covenants and agrees to pay to the lessors an amount equivalent to $12\frac{1}{2}$ per centum of the net proceeds at the well of all oil produced and sold from the demised premises or any part thereof, such payment to be made on the 20th day of each and every calendar month out of the proceeds of the oil produced and sold during the next-preceding calendar month. The lessee shall also pay to the lessors the sum of one hundred dollars ($100.00) per well per annum for all wells which may be drilled upon the demised premises and which shall produce gas in paying quantities, as herein provided, and said sum of $100.00 per well per annum shall be the consideration in full to the lessors for all gas wells which may be discovered upon the demised premises, and shall be due and payable when any such well is brought in and annually thereafter.

"The lessors covenant and agree that the lessee shall have the right to use such oil as may be necessary or convenient in the operation and development of the demised premises, without paying any royalty thereon, and the lessee shall also have the right to use without charge therefor all water which may be developed on said

premises, and all gas, whether or not found in paying quantities which may be necessary or convenient in the operation and development of said property; and the lessee agrees that if he shall produce gas on the demised premises, which shall be made usable for lighting purposes, the lessors shall have the right to a supply of such gas without charge therefor for lighting their dwelling and the quarters of their men on the demised premises, provided that the lessee shall be subjected to no expense on account thereof, and that the lessors shall pay the cost of the pipeline and apparatus for piping said gas to said buildings and shall connect the supply pipes to the fixtures in said buildings and shall maintain said fixtures in good order and repair at their own expense.

## V

"The lessee further agrees to keep proper drilling records and correct books of account of all oil produced and sold from the demised premises, and that the lessors or their duly authorized representatives shall at all reasonable times during business hours have access to said drilling records and books of account, for the purpose of inspecting the same, and that the lessors or their duly authorized representatives may at any time go upon any portion of the demised premises where drilling operations are in progress, and observe said operations; provided, however, that neither the lessors nor their representatives shall at any time interfere or meddle with, interrupt or in anywise hamper or obstruct any operations of the lessee on said premises.

## VI

"The lessee shall pay all State, County and other taxes and assessments of every kind which may be levied upon or assessed against any improvements placed or erected upon the demised premises by the lessee, while the lessee remains in the occupancy of said premises under this lease, and the lessors shall pay all State, County and other taxes and assessments of every kind which

may be levied upon or assessed against the demised premises or against any improvements thereon belonging to or placed or erected thereon by the lessors.

"The lessee further agrees to indemnify and hold harmless the lessors against any and all claims for work or labor done, or materials or supplies furnished to or at the instance of the lessee while he is in the occupancy of the demised premises under this lease.

### VII

"Any notices required to be given by the lessee to the lessors hereunder shall be enclosed in an envelope addressed to the lessors at Grand Junction, Colorado, and deposited in the United States mail, postage prepaid, or the same may be delivered to either of the lessors personally.

### VIII

"The lessors hereby give and grant to the lessee the first right and option to purchase the demised premises or any portion thereof which may be offered for sale by the lessors at any time within five years after the commencement of the term of this lease; said right and option to purchase to be at the price in good faith offered by any genuine bidder or prospective purchaser for said land or any portion thereof; in the event the lessors shall receive any such offer, they shall immediately upon receiving the same give the lessee written notice thereof, and shall describe in such notice the land proposed to be sold and the price offered therefor, and the lessee shall have thirty days from and after the receipt of such notice in which to exercise said right and option, and if he shall conclude so to do, he shall, within thirty days, notify the lessors of his exercise of said right and option, and upon tender to him by the lessors of a good and sufficient warranty deed conveying said property to him, together with an abstract of title showing title in fee simple absolute in said lessors and that said property is free and clear of all liens and encumbrances, the lessee shall pay to the lessors the said purchase price.

"If the lessee shall not exercise said right and option within said period of thirty days, he shall be deemed to have waived the same as to the particular offer referred to in said notice, but said right and option to purchase shall continue during said period of five years as to any other offers or proposed sales, but said right and option shall at all events terminate at the expiration of said period of five years.

IX

"This lease and agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns of the respective parties hereto."

May 28, 1919, the period of time within which to commence drilling operations was extended "until and including the 10th day of July, 1920." July 10, 1921, in an agreement reciting that a well had been commenced, time and until July 10, 1924, was granted within which to resume drilling operations, and the maturity of the $25,000 note was postponed to the same date. May 20, 1924, an extension of two years from July 11, 1924, was granted and payment of the note likewise extended. As further consideration for extension of the time to resume drilling operations the defendants were paid a bonus of $2,500 and the rental increased from $300 to $425 a month, of which latter sum $125 was to be retained each month in payment of interest on the defendant's note. July 9, 1926, a further extension of time for resumption of drilling and payment of the note to July 10, 1927, was made, a bonus of $1,000 paid the defendants, and the $425 rental continued. May 14, 1927, a further extension of time to resume drilling was granted "beyond the 10th day of July, 1927, for and so as to permit said party of the second part to resume said drilling operations on said land at any time prior to the expiration of one hundred twenty days after either the completion or abandonment of the well now being drilled on the Gray Permit, in no event to exceed or extend beyond the 10th day of July, 1928, the said parties of the

first part hereby waiving any and all right to cancel or declare forfeiture of said lease and any right or claim for damage which they have or may have by reason of the failure of lessee to commence, continue and/or resume drilling operations on said premises within the time hereinabove limited." Payment of the note was also extended for the same period, and the rental of $425 continued. October 24, 1927, another and the last extension agreement between the parties was made. It reads:

"This agreement, made and entered into this 24th day of October, A. D. 1927, by and between James W. Rector and Rosa M. Rector, his wife, of Grand Junction, County of Mesa, State of Colorado, parties of the first part, and Associated Oil Company of Wyoming, a Wyoming Corporation, party of the second part, witnesseth:

"That whereas, on the 28th day of June, 1918, the parties of the first part leased to one W. J. Luke, Jr., certain tracts of land situate, lying and being in the County of Rio Blanco, State of Colorado, described in said lease and in the Deed of Trust hereinafter referred to, for the term of twenty years commencing on the 11th day of July, 1918, which lease was recorded on the 5th day of August, 1918, in Book 55 at page 79, of the Records in the office of the County Clerk and Recorder of said Rio Blanco County, Colorado, reference to which is hereby made for further details thereof and the description of which said lands as contained in said lease is made the description thereof herein by reference to the record of said lease as aforesaid, and

"Whereas, on the 11th day of July, 1918, the parties of the first part executed and delivered to the said W. J. Luke, Jr., their promissory note dated on said 11th day of July, 1918, and payable on or before three years after the date thereof to the order of the said W. J. Luke, Jr., in the principal sum of twenty-five thousand ($25,000) dollars, with interest thereon from the date thereof until paid at the rate of six per cent (6%) per

annum, interest payable semi-annually, which said note was and is secured by Deed of Trust of even date therewith covering all of the lands and premises included within the lease hereinabove referred to and which said Deed of Trust appears of record in the office of the County Clerk and Recorder of Rio Blanco County, Colorado, in Book 46 at page 500, reference to which record is hereby made for further particulars hereof, and

"Whereas, through various assignments, the said lease, as well the promissory note and Deed of Trust hereinabove mentioned and described, have been sold, assigned and transferred to Associated Oil Company of Wyoming, party of the second part hereto, said Company being the present holder and owner of said lease, promissory note and Trust Deed, and

"Whereas, the drilling of a well was commenced on the lands and premises covered by said lease within the time specified by said lease and the extensions thereafter granted, and

"Whereas, said drilling operations were discontinued by and with the approval and pursuant to the understanding and agreement of all parties interested, and various extensions of time for the resumption of said drilling operations, as well the extension of time of payment of said promissory note have been had and agreed upon between said parties, all of said supplemental agreements and contracts, prior to July 9th, 1926, providing for extension of time within which to resume drilling operations, and extending the time of payment of said promissory note as aforesaid, are detailed and specifically set forth in the supplemental contract and agreement, bearing date of July 9, 1926, and reference is hereby made to such contract for further particulars relating to the details of the various extensions and provisions of the respective supplemental contracts and agreements, and

"Whereas, by the terms of Supplemental Contract bearing date of July 9, 1926, the time within which to

resume drilling operations on said lands covered by said lease was extended to July 10, 1927, and,

"Whereas, by the Supplemental Contract, entitled, 'Drilling Extension Agreement,' bearing date of May 14, 1927, the time within which to resume drilling operations being thereby extended so as to permit said lessee to recommence drilling operations on the lands covered by said lease at any time within and prior to the expiration of one hundred twenty days after either the completion or abandonment of a certain well at that time being drilled on the Gray Permit, the time of payment of said promissory note being likewise extended for the same period of time, and

"Whereas, the drilling of said well on the Gray Permit has not proven a successful venture, for which reason the lessee now contemplates its abandonment, and

"Whereas, all parties hereto are desirous of securing some adequate test of the structure on which said lands are located and to this end are willing to cooperate in order that a complete and sufficient test may be made of said structure and its possibilities for oil and/or gas production fully determined.

"Now, therefore, in consideration of the premises aforesaid and of the several covenants and agreements on the part of the respective parties hereto herein contained, it is hereby mutually agreed:

"1. That the time within which said party of the second part hereto shall resume drilling operations on the lands covered by the lease hereinabove mentioned and referred to shall be and is hereby extended so as to permit said party of the second part to resume or recommence drilling operations on said lands at any time within and prior to the expiration of one hundred twenty days after either the completion or abandonment of another test well located at some point on the structure not yet definitely determined, said test well to be commenced on or before the first day of August, 1928, the said parties of the first part hereby waiving any and all

right to cancel or declare forfeiture of said lease and all the right or claim for damage which they may have by reason of the failure of lessee to commence, continue and/or resume drilling operations on said premises within the time hereinabove limited.

"2. That said contemplated new test well may be drilled either by the lessee company individually or may be a joint operation under agreement by and between lessee company and any other company operating or contemplating drilling operations on said structure, or with two or more of such companies, any such joint operation to be held a full compliance with the terms of this agreement, providing the said lessee company is one of the parties to such joint operation.

"3. The party of the second part agrees that said contemplated test well, if drilled, shall be commenced on or before the first day of August, 1928, and the drilling thereof prosecuted with reasonable diligence; strikes, lock-outs, acts of God, unavoidable accidents and interferences not within the control of the party of the second part excepted. Drilling shall continue, subject to the above exception, until oil shall be encountered therein in sufficient quantities to pay to pump or otherwise secure and save or until said well has been drilled to a depth at which it is deemed by said company practicable to abandon the same.

"4. For the purpose of this agreement the abandonment of said well shall be deemed conclusive at any time said drilling company may remove its drilling equipment from location thereof or discharge its employees or disband its operating organization and shut down operations permanently at such well. It is also agreed that abandonment may occur by the simple failure of said party of the second part to commence either an individual or joint operation on said structure prior to August 1, 1928, the lessee company hereby reserving unto itself the right to at any time declare abandonment.

"5. Should the said lessee company elect to exercise

its reserved right to declare an abandonment of such contemplated test well it may do so at any time, either prior to the commencement of said well or afterwards, by giving the parties of the first part thirty days' written notice of its intention to so declare abandonment, at the expiration of which time of notice it shall have the right to quitclaim, release and relinquish unto the parties of the first part all of its interest in said lands covered by the lease hereinabove referred to without further obligation on the part of said lessee company in any way or manner whatsoever.

"6. The date of maturity of said promissory note is likewise extended for such period of time as the lessee company shall continue to hold the lands of parties of the first part pursuant to the terms of its lease thereon hereinabove referred to and described, said note to be considered due and immediately payable at any time upon the expiration of said lease, whether by expiration of time, forfeiture, voluntary, involuntary abandonment or arising in any other way or manner whatsoever.

"7. It is further agreed that this contract is supplementary to the lease of June 28th, 1918, and to each, all and every of the subsequent amendments and supplements thereto, and that this agreement affects the provisions of said original lease, as amended and supplemented by subsequent contracts, in no way or manner whatsoever except in the granting of the additional time within which to commence or within which to resume drilling operations on the lands covered thereby as hereinabove provided, as well the extension of the maturity date of the promissory note hereinabove mentioned, this agreement, in no way or manner, to modify, change or affect the provisions of said lease, as heretofore amended as aforesaid, relative to the payment of rentals on said lands covered thereby or the payment of interest on said note; said original contract, as heretofore supplemented and amended, being hereby ratified and confirmed in all particulars and to be hereafter held

operative, binding and effective by and between all parties hereto, to the same extent as originally contemplated, except for the extension of time hereby granted.

"8. The above and foregoing constitutes the full and complete agreement by and between the parties hereto and that nothing is to be taken against either party by implication and no implied covenants or conditions are to be read into said contract or considered in connection therewith.

"In witness whereof the said parties of the first part have hereunto affixed their signatures and the said party of the second part has likewise hereunto affixed its corporate name and seal by its authorized officers at the day and date first hereinabove written."

No drilling, on the Rector land or elsewhere, was undertaken under the agreement just quoted. The only drilling operations ever actually carried on on the Rector lands were in parts of the years 1920 and 1921, but the well went only to a depth of 2,000 feet and was never completed as provided in the lease. The actual test of the structure apparently was made on the Gray permit mentioned in the agreement of May 14, 1927, and was found to be unproductive and abandoned. During all of the time from the making of the lease to July 11, 1928, except we assume for the short period during which operations on the Rector lands were carried on, the defendants received rent of $300 or $425 a month.

The position of the defendants is that the lease created an estate for twenty years in their lands which could be divested only by the execution and delivery to them of a conveyance from the plaintiff, and that until such conveyance the obligation to pay rent continues. The plaintiff contends that by the terms of the lease and the various extensions, and the construction placed upon these instruments by the parties, the respective rights of the parties came to an end on August 1, 1928. We have been favored by exhaustive briefs discussing many decisions concerning the law relating to oil and gas, but in

the view we take of the case it is unnecessary to notice them and their seeming inconsistencies. Our task is to construe the agreements made in light of the conduct of the parties and to that task the authorities referred to our consideration bring little light.

█ The lease provided, as did the first extension, that upon failure of the lessee to exercise the right to drill the lease should terminate upon a named day. The subsequent agreements fix definite and certain limits within which drilling operations may be resumed. Under such circumstances it might be of profit to inquire whether the clause concerning termination of the lease, and the limitations in the later agreements, were in favor of the lessors only. But here we are spared such inquiry for it is apparent from the evidence, the defendants' brief, and consideration of all the agreements together, that the parties from the beginning considered that the rights of the plaintiff (or its predecessors) ceased absolutely at the end of each of the periods designated in the several instruments. If the construction now contended for by the defendants had been the intent of the parties the subsequent agreements were unnecessary. Certainly the defendants would not have asked nor the plaintiff paid bonuses and increased rentals if the original lease remained in full force and vigor. It is too late now, we apprehend, for the defendants to urge that the lease is in force which they consistently treated as having, in the absence of agreed extensions, definite limitation. As we said in *Hinkle v. Blinn,* 92 Colo. 302, 19 P. [2d] 1038, "We conclude that the conduct of the parties before the controversy arose, acting under the contract, is a reliable test of their interpretation of the instrument, and whatever the stress of subsequent disagreement, neither in his own interest may be heard to urge a different construction." Our conclusion upon this point is, therefore, that by their own interpretation of the several instruments the parties agreed the correct construction of them was that at the end of each period

of limitation the right of the plaintiff to go upon and prospect the defendants' land, and the right of the defendants to receive rent, ceased.

■ ■ As to the question of reformation of the deed of trust with respect to water rights the plaintiff has repeatedly stated that although it does not concede the correctness of the ruling it has no objection to the decree in that respect. As to the reformation with regard to exclusion of all oil and gas rights from the deed of trust, however, it urges there was error. The only reference in the deed of trust to oil and gas rights is contained in the clause reading: "This deed of trust is subject to a certain Oil Lease bearing date June 28, 1918, made by the grantors to W. J. Luke, Jr." Upon the trial there was little, if any, evidence to sustain the defendants' contention on this head. Certainly there was not the quantum required by the rule that reformation is granted only when the proof is clear, unequivocal and indubitable. *Anderson v. Coal Co.*, 83 Colo. 562, 267 Pac. 400; *Merrick v. Morelock*, 73 Colo. 245, 215 Pac. 133; *Hoback v. Rink*, 84 Colo. 391, 270 Pac. 872. Indeed, it would appear from the argument of the defendants here that they rely more upon law than evidence in this connection. In their brief they did say that "According to the Century Dictionary, to 'subject to' is 'to become subservient to.' In *Yarg Corporation v. Iles Co.*, 88 Colo. 412, 297 Pac. 1001, it appears that a trust deed was executed and thereafter an oil and gas lease was made subject to the trust deed. Thereafter there was a foreclosure of the trust deed. In the opinion the court said: 'This lease being subsequent and subject to said deed of trust, the rights thereunder were foreclosed by the foreclosure suit.' We urge that the converse of this proposition must necessarily be true, and that is, if the trust deed is made subsequent and subject to the lease, then the rights granted under the lease do not pass under the trust deed." We cannot agree with counsel. The deed of trust contained covenants of warranty and con-

veyed the fee title, and necessarily carried with it any oil and gas rights not covered by the Luke lease and the reversion occurring when that lease came to an end.

■■ The court also decreed that the approximate $10,000 it found due the defendants from the plaintiff be applied in payment of the $25,000 note and ordered the release of 160 acres of land and accompanying water rights from the deed of trust. The only theory upon which this could be done was that such constituted payment within the language of the trust deed. That language is:

"The grantors herein have reserved the right in the note given, for which this trust deed is security, to pay $5000 or any mutiple thereof on the principal note at any interest-payment date, and it is understood and agreed between the parties to this instrument that, upon the payment of the sum of $5000, the said trustee shall release any 80-acre tract selected by the grantors herein from the lien of this trust deed, and that the receipt for said $5000 and notice of the tract selected shall be ample authority for the said trustee to execute and deliver a release deed of said tract so selected." Did that language authorize the court to decree as it did? Again we are obliged to hold that there was error, for, as has been said, "A set-off or counterclaim does not amount to payment, since there has been no delivery of money by the debtor to the creditor. An additional reason for holding that a set-off or counterclaim is not payment is that the parties did not intend that it should be payment when the transaction out of which the set-off or counterclaim was entered into." 5 Page on Contracts (2d Ed.), §2804. Nor is a debtor obliged to accept even a legal tender in payment at a date other than that upon which the payment is due, or, as here, may be made. *Id.*, §2825.

For the reasons appearing the judgment should be reversed. Let the order be, therefore, that the judgment be reversed with instructions to vacate the decree, except as to the reformation concerning water rights,

and enter decree of foreclosure as prayed, the sum of recovery to be ascertained by adding to the face of the note interest from August 1, 1928.

MR. CHIEF JUSTICE BUTLER and MR. JUSTICE BOUCK concur.