**EAST & WEST INS. CO. OF NEW HAVEN, CONN., v. FIDEL.**

**No. 326.**

Circuit Court of Appeals, Tenth Circuit.

April 6, 1931.

J. O. Seth, of Santa Fe, N. M., for appellant.

Carl H. Gilbert and M. W. Hamilton, both of Santa Fe, N. M., for appellee.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

McDERMOTT, Circuit Judge.

The plaintiff recovered in this action at law upon two fire insurance policies, and the company appeals. The case was tried without a jury, and most of the facts were stipulated. The sole question presented is whether the policies, or either of them, cover a three-story brick building adjacent to and communicating with the two-story brick building described in the policies. The trial court found that the description in both policies was ambiguous, and that the parties intended to cover both the two-story older part as well as the three-story newer part of a building known as the Fidel Building.

The $20,000 policy was issued on June 12, 1927, while the three-story addition was in course of construction; the $5,000 policy was issued on February 12, 1928, some five months after the addition was completed. The description of the property in both policies is identical, and is:

" * * * on the two story Composition roof brick building, * * * occupied as Feed and Variety Store and Warehouse on first floor and Hotel on the second floor, situated Southwest corner of Galisteo and Water Streets, Sanborn Map Page 5 Nos. 128–27–28 City of Santa Fe, State of New Mexico."

The policy provided that the company should not be liable for damage occurring "while mechanics are employed in building, altering or repairing the described premises beyond a period of 15 days," unless permission therefor was endorsed on the policy. Such an "Alterations and Repairs Permit" was endorsed on each policy, which reads:

"Permission granted for mechanics to be employed for more than fifteen (15) days in making alterations, improvements and repairs to any building herein described, and in constructing additions or sheds which attach to and communicate with such building, and the insurance, if any hereunder, on such building, is hereby made to cover such alterations, improvements, repairs, attached and communicating additions and sheds, also building materials and supplies therefor, while contained therein or on the premises immediately adjacent thereto; and the insurance, if any, hereunder, on contents of any building herein described is hereby made to cover in such attached and communicating additions and sheds to said building; but any change in a fire wall, the removing or replacing of the joists or supports of a floor, or the construction of additional stories of any building herein described, when mechanics are employed for such purposes for more than fifteen (15) days at any one time, shall not be permitted by this policy, unless specifically included by endorsement attached hereto."

The policy also contains the customary provision that no waiver shall be binding unless in writing and endorsed on the policy.

A fire occurred on June 19, 1928; an agreement was made to appraise the damage, and an award made finding that the two-story portion of the building was worth $23,018.10 and was damaged to the extent of $1,427.91; that the three-story portion was worth $38,968.03 and was damaged to the extent of $27,766.55. The company offered to pay its share of the loss on the two-story building, but denied any liability on account of the loss on the three-story building. The parties have stipulated

"That if the policies of the defendant, Exhibits 'A' and 'E' to the complaint herein cover only the two-story building hereinabove described, plaintiff is entitled to recover only the amount heretofore tendered by plaintiff, to-wit: $1,368.10; that if both said policies cover both the two-story and three-story buildings, plaintiff is entitled to recover the sum of $14,718.33, and interest and costs of suit, that if Exhibit 'A' [the $20,000 policy] covers both the two-story building and the three-story building, and Exhibit 'E' [the $5,000 policy] covers only the two-story building, plaintiff is entitled to recover $12,048.69 and interest, and costs of suit."

The facts stipulated, together with the most favorable version of plaintiff's testimony, disclose that on June 12, 1924, plaintiff owned a frontage of 120 feet on Galisteo Street, at its intersection with Water Street, in Santa Fe. On the corner, and extending south approximately 69 feet 1½ inches, there was a two-story brick building with a composition roof, erected in 1922. The second story was used as a hotel; there were three ground floor rooms, the corner room being occupied by a variety store, the next room as a lobby or entrance to the hotel, and the south room as an office connected with a feed store, and in which there was occasionally stored small quantities of grain. The "Sanborn Map" referred to in the policies, was prepared by and for the convenience of the insurance companies doing business in Santa Fe. "Page 5, Nos. 128–27–28" thereof described the land on which this building was located and approximately one foot more.

On the south 52 feet of such frontage, in 1924, there was a one-story brick and adobe

building occupied by a feed store, warehouse and laundry. On June 12, 1924, two policies were issued on these properties, one for $22,000, which described the "two-story composition roof brick building" in the identical language as the policy in suit. The other was for $3,000 and its description reads:

"The one-story composition and earth roof adobe and brick buildings, including foundations, plumbing, electrical wiring and stationary heating, lighting and ventilating apparatus and fixtures therein; also all permanent fixtures, stationary scales and elevators, belonging to and constituting a part of said buildings; occupied as grocery, feed store and laundry, situated Galisteo Street—Sanborns Map page 5—Nos. 120 and 30, City of Santa Fe, State of New Mexico."

"Sanborn's Map page 5—Nos. 120 and 30" describes the property—except for about one foot—on which was located the one-story brick and adobe building. In the spring of 1927 the plaintiff tore down the one-story brick and adobe building and commenced the construction of the three-story brick building on the same ground; the south wall of the two-story building was built up another story, and used as the north wall of the new structure. On June 12, 1927, both of the policies expired; the policy of $3,000 on the one-story building was not renewed; the $22,000 policy was renewed, the description being identical with its predecessor, and is one of the policies now in suit. At that time the outer walls, roof, sub-floors, joists, supports and partitions of the three-story structure were completed. However, mechanics were employed in finishing the structure until September, 1927. When completed, the upper floors of the two buildings were so connected as to be used as one hotel, and the entire structure was known as the Fidel Building. It is stipulated that "said three-story building was so erected as to be a communicating addition to the two-story building hereinabove referred to." The occupancy of the ground floor of the three-story building is not shown. Since February, 1927, the south room of the two-story building has been occupied as an electric store.

In September, 1927, the plaintiff. advised the agent of the defendant at Albuquerque, of the new addition, and asked to have the $3,000 policy (which had already expired) cancelled, to have an 80 per cent. co-insurance clause substituted for the 90 per cent. clause in the $22,000 policy, and to have it reduced to $20,000. The agent advised him that the $22,000 policy would cover the three-story addition. The policy was reduced as requested. In February, 1928, the $5,000 policy in suit was issued.

### The $20,000 Policy.

The plaintiff claims that there are both patent and latent ambiguities in the $20,000 policy, the patent ambiguities arising from the description contained in several subsequent endorsements. These claims need not be explored, for we have no doubt that liability exists as to this policy by its terms. When it was issued, in June, 1927, a communicating addition to the two-story building was in course of construction; mechanics were engaged thereon for more than 15 days thereafter. The "Alterations and Repairs Permit" granted the necessary permission to so use such mechanics on such addition. The mechanics were not however engaged in any of the structural changes forbidden by the last sentence of the Permit; that part of the work, with its incidental hazards, had been completed before June 12. The Permit was therefore operative. The Permit expressly extends the coverage to additions being constructed under it; the language is clear and unequivocal; it reads: "and the insurance, if any hereunder, on such building, is hereby made to cover such alterations, improvements, repairs, attached and communicating additions and sheds." It is stipulated that the three-story structure is a "communicating addition"; the policy therefore covers it in terms. The defendant contends that the three-story structure cannot be considered an "addition" because it is larger than the building to which it was added. There is nothing in the contract which limits the size of additions; and where an insurance contract covers "additions," the comparative size or cost thereof is not material. Ayers v. Palatine Insurance Co., 234 N. Y. 334, 137 N. E. 608.

### The $5,000 Policy.

The $5,000 policy presents a question of considerable perplexity. It does not purport to cover "additions" as do many of the policies in the cases cited by plaintiff. While it contains an "Alterations and Repairs Permit," that Permit can have no reference to the addition here involved, for it grants permission to do something in the future, and the addition in question had been long since completed; this addition was not in process of construction when this policy was issued; no mechanics were thereafter employed thereon; the clause cannot therefore attach to nor cover the three-story structure. Nor is the September conversation of assistance;

that conversation concerned itself with the $20,000 policy, the only one then in existence; the agent told the plaintiff correctly that that policy covered the three-story structure. The $5,000 policy was not then in contemplation; but if it were otherwise, the conversation would have become merged in the writing later entered into, under familiar rules. Nor is any claim made that a patent ambiguity exists in the $5,000 policy, for the endorsements with differing descriptions are not on this policy.

Notwithstanding the absence of any patent ambiguity in the policy, the court may receive evidence of the actual intent of the parties if a latent ambiguity is disclosed by the surrounding circumstances. But in an action at law, the existence of such a latent ambiguity must first be established before extrinsic evidence of actual intent is admissible. Queen Ins. Co. v. Meyer Milling Co. (C. C. A. 8) 43 F. (2d) 885. After an ambiguity is established, a contract is construed strictly against the party which drafted it. Graham v. Business Men's Assur. Co. (C. C. A. 10) 43 F. (2d) 673, and cases therein cited. But it is not true that a strained construction will be resorted to in order to establish an ambiguity which does not exist. Courts do not force an ambiguity in order to resolve it against an insurer. In the recent case of U. S. Fidelity & G. Co. v. Guenther, 281 U. S. 34, 50 S. Ct. 165, 166, 74 L. Ed. 683, the Supreme Court quoted with approval from the earlier case of Imperial Fire Insurance Co. v. Coos County, 151 U. S. 452, 462, 14 S. Ct. 379, 38 L. Ed. 231, as follows:

"It is settled * * * that, when an insurance contract is so drawn as to be ambiguous, or to require interpretation, or to be fairly susceptible of two different constructions, so that reasonably intelligent men, on reading the contract, would honestly differ as to the meaning thereof, that construction will be adopted which is most favorable to the insured. But the rule is equally well settled that contracts of insurance, like other contracts are to be construed according to the sense and meaning of the terms which the parties have used, and, if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense."

Judge Walter H. Sanborn, speaking for the Eighth Circuit Court of Appeals, tersely stated the rule in Standard Life & Accident Ins. Co. v. McNulty, 157 F. 224, 226, as follows:

"Counsel for the plaintiff invoke the familiar rule that a policy of insurance should be construed favorably to the insured in cases of doubt or ambiguity. But this rule ought not to be permitted to have the effect to make a plain agreement ambiguous, and then to interpret it in favor of the insured."

See, also, Fred J. Kiesel & Co. v. Sun Ins. Office of London (C. C. A. 8) 88 F. 243, and McGlother v. Provident Mutual Acc. Co. (C. C. A. 8) 89 F. 685, 689.

The question in this case then is, Is there substantial evidence in the record to support the finding that there is a latent ambiguity in the coverage of the $5,000 policy? The plaintiff's principal reliance is upon Queen Ins. Co. v. Meyer Milling Co., supra; Prussian National Ins. Co. v. Terrell, 142 Ky. 732, 135 S. W. 416; Davenport v. Firemen's Ins. Co., 47 S. D. 426, 199 N. W. 203; Still v. Connecticut Fire Ins. Co., 185 Mo. App. 550, 172 S. W. 625; and other cases holding that where a building is insured, the whole building is covered. With the holding and reasoning in Queen Ins. Co. v. Meyer Milling Co., we are in thorough accord. The facts in that case disclosed a striking example of a latent ambiguity. That policy insured a building located on certain lots; but going to those lots, one would not find the building and appurtenances described; instead, one would find only a slice of an integral building, a segment without the elevators and heating apparatus described, and unusable for any purpose. The building and appurtenances described did not jibe with the location described. There was therefore a latent ambiguity. But in our case the description of the land fits the building described. The policy covers a "two-story composition roof brick building * * * situated Southwest corner of Galisteo and Water Streets, Sanborn Map Page 5 Nos. 128–27–28." While the Sanborn Map is not an official designation, the parties are competent to use it as a means of identification. Going to the corner designated, one would discover on the identified ground, the two-story building described. Could any confusion arise in the minds of any one as to what was intended, simply because there was adjacent to it a communicating three-story building using a common party wall? Or, to put it another way, would any reasonable person believe that the parties intended to insure not only the two-story building so aptly described, but also the three-story new building not described, and which was not located on the designated lots? Least of all, could the plaintiff be misled?

He had carried a policy with this identical description on this two-story building since 1924, and had carried another policy, with an entirely different description, on the building then located on the adjacent lots. It is true the upper floors of the two structures are communicating, and are used as one hotel; it is true that the entire structure is called the Fidel Building; but whether called two buildings or one, the fact remains that they are two structures, erected at different times, and on different locations. It is likewise true that the policy discloses that one of the store rooms was occupied as a warehouse rather than an electric store; but there is no evidence that any store room in the new building was occupied as an electric store. But this, to our minds, indicates an omission or error as to occupancy, and does not raise a reasonable doubt as to the identity of the building otherwise so accurately and meticulously described.

The painstaking and commendable researches of counsel on both sides disclose a paucity of helpful authorities on the subject, to which our own investigation has added nothing. That there are two classes of building coverage, one "with additions," and one with no reference thereto, is well known; and, to use the language of the Kentucky Court "It is a rule not denied anywhere that a policy of fire insurance does not cover additions made to an insured building unless the contract so provides." Old Colony Ins. Co. v. Berryman Realty Co., 193 Ky. 7, 234 S. W. 748, 750, 21 A. L. R. 292, and Annotation, page 300. Cases involving policies which cover "additions" are therefore not in point. Nor do we conceive to be in point the cases which hold the insurance of a "building" covers all inseparable and constituent parts thereof. The case most nearly in point is Freed Realty Co. v. National Fire Ins. Co., 161 La. 102, 108 So. 228, where it was held that a policy on a one-story composition roof brick building did not cover an adjacent two-story slate roof building using a common wall and owned by the same person. Both the Federal and State courts of New York have held that a policy on a described building did not cover a new building erected nearby to take the place of the building insured, although the company knew the insured building had been replaced and examined and approved the new building. Arlington Mfg. Co. v. Norwich Union Fire Insurance Co. (C. C. A. 2) 107 F. 662; Arlington Co. v. Empire City Fire Insurance Co., 116 App. Div. 458, 101 N. Y. S. 772.

It may be, as argued, that the parties intended to insure the three-story building not described. But this is not an action to reform a contract. It is an action on the contract. Unless it can fairly be said that the description is ambiguous, there can be no recovery for the loss to the three-story building under this policy. The question is not free from doubt, but on the whole we conclude that it cannot fairly be said that there is any real ambiguity as to this description; and we are unwilling to force a construction on the plain language used in order to arrive at that end.

The judgment is reversed, with instructions to enter a judgment for the plaintiff in the sum of $12,048.69 and interest and costs, as stipulated. One-fifth of the costs in this court will be taxed to appellee; four-fifths to appellant.

Reversed.