**PEARL ASSUR. CO.**, Limited, et al.

v.

**SCHOOL DIST. NO. 1 IN SAN MIGUEL COUNTY, COLO.**, et al.

**SCHOOL DIST. NO. 1 IN SAN MIGUEL COUNTY, COLO.**, et al.

v.

**PEARL ASSUR. CO.**, Limited.

Nos. 4789, 4790.

United States Court of Appeals Tenth Circuit.

April 28, 1954.

Richard D. Hall, Denver, Colo. (Ronald V. Yegge, Denver, Colo., on the briefs), for appellants and cross-appellees.

Harrison Loesch, Montrose, Colo. (Strang, Loesch & Kreidler, Montrose, Colo., on the briefs), for appellee and cross-appellant.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

School District No. 1, hereinafter referred to as the District, brought this action against the Pearl Assurance Company, Ltd., and eight other insurance companies, hereinafter referred to collectively as the Insurance Companies, to recover for a fire loss under twelve policies issued by the Insurance Companies to the District. The case, originally brought in the state court, was duly removed to the United States District Court for the District of Colorado. The case was tried before the court without a jury. The underlying facts are not in dispute.

In 1895 and 1896 the District constructed a two-story brick school building. In 1902 it constructed a two-story brick addition thereto. The original building and the addition had a tin and shingle roof. They were located on Lots 14 to 17, and Lots 24 to 27 and the alley between Lots 14 and 17 and Lots 24 to 27, in Block 3, West Telluride, Colorado. In December, 1948, the District completed the construction of a quonset-type building, to be used as a gymnasium and for other educational purposes. It will hereinafter be referred to as the Gymnasium. It was constructed of steel, except portions of the west side and the front which were brick, cinder block and glass brick. Any portion of the Gymnasium which might be regarded as a roof was steel, and it was a one-story building. It was located on Lots 18 to 23, inclusive, in Block 3 and the alley lying between Lots 18, 19 and 20 and Lots 21, 22 and 23. The main portion of the Gymnasium was 141 feet long and 41 feet, 6 inches wide and it had an 81-foot by 17-foot extension on its west side. After its completion it was used for the athletic program, band instruction and band classes, physical education classes and dramatics, functions which were carried on prior to its construction in a recreation hall situated at another location and in the two-story building. The basement of the two-story brick building had been used by the lower grades for physical education and for band instruction. The Gymnasium was located 23 feet, 6 inches westerly from the two-story brick building. It was connected with the two-story brick building by a steam line, a hot water line, an electric power line and a common sewer which served both buildings. It was also connected by a wooden passageway between the Gymnasium and the two-story brick building, which was bolted to the Gymnasium building and nailed at the other end to the two-story brick building. The passageway had a concrete floor. Its

superstructure was wooden and it was covered with roofing paper.

One of the insurance policies was issued July 1, 1948, in the amount of $3500 and was in force when the Gymnasium was under construction and at the time of its completion. The other eleven insurance policies were issued between July 1, 1949, and November 1, 1950, after the completion of the Gymnasium in December, 1948. The policies, under the heading "Name of Building," either described the building as "Telluride Public School," "Telluride Public Schools" or "Telluride High School"; under the heading "Height, Construction and Roof," as "Two-story shingle and tin roof brick building," "Two-story brick shingle" or "Two-story brick shingle roof"; and under the heading "Location," seven of the policies described the property insured as located on "Lots 13–20, inc., Blk. 3, West Telluride, Colo." and the other five policies described the property as located on "Lots 13–28, inc., Blk. 3, W. Telluride Addition to Telluride, Colo."

Each of the policies contained the following Alterations and Repairs Permit provision:

"Alterations and Repairs Permit: Permission granted to make alterations, improvements and repairs to any building herein described, and to construct additions or sheds which attach to and communicate with such building, and the insurance, if any hereunder, on such building, is hereby made to cover such alterations, improvements, repairs, attached and communicating additions and sheds, also building materials and supplies therefore, while contained therein or on the premises immediately adjacent thereto; and the insurance, if any hereunder, on contents of any building herein described is hereby made to cover in such attached and communicating additions and sheds to said building; * * *."

From the year 1939 the insurance business of the District was handled by Marguerite G. Ballard and Nan Leino, who were resident agents of the Insurance Companies, with authority to countersign and issue policies.

About July 1, 1950, Mrs. Ballard delivered two policies to Donald A. O'Rourke, secretary of the Board of Education of the District, and asked him if the District would be interested in purchasing additional insurance. O'Rourke told Mrs. Ballard that the District was in bad financial condition; that he did not think it was able to buy additional insurance, but that he did not know how the other members of the Board felt. Neither Mrs. Ballard nor O'Rourke said anything about coverage under the then existing insurance policies.

There had been no changes in the total face amount of the policies or in the provisions thereof from 1946 to February 1, 1951, when a fire broke out in the Gymnasium building, resulting in almost complete destruction to both building and contents, but only minor damage to the two-story brick building.

Prior to the construction of the Gymnasium building the District never carried insurance on only a part of the school property. Both agents lived in proximity to Block 3, and knew of the construction of the Gymnasium building. From as far back as 1939, the insurance agents had handled the insurance business with a free hand, preparing the policies and choosing the companies with which they should be written. Each of the policies was for a three-year term and carried the notation "Renewal of Former Policy," designated by number, and if the new policy was issued by a different company, the name of the company issuing the preceding policy was stated.

At the pre-trial conference it was stipulated that at the trial the question of liability would first be adjudicated, and that in the event the court found the Insurance Companies liable, the parties would undertake to agree upon the amount of recovery. The trial court

found that the policies covered the Gymnasium. The amount of the loss was stipulated. The policies provided that where the amount of loss was ascertained by the agreement of the parties, the Insurance Companies should have 60 days thereafter within which to make payment. That period expired August 16, 1953. The court entered a judgment for specified amounts against the several Insurance Companies, with interest from August 16, 1953. The Insurance Companies appealed from that judgment and the District has cross-appealed from that part of the judgment which awarded interest from August 16, 1953. The District contends that it should have been allowed interest from April 3, 1951, the date it filed proofs of loss with the Insurance Companies.

■ When the surrounding circumstances disclose a latent ambiguity in a contract of insurance, extrinsic evidence is admissible to determine the real intent of the parties thereto, with respect to coverage.[1]

■ When an ambiguity has been established, the policy will be construed most strongly against the insurer who prepared it.[2]

■ The policies described the name of the building insured as the "Telluride Public School," "Telluride Public Schools" or "Telluride High School." The Gymnasium was an integral part of the high school physical plant and might well be regarded as within such descriptions. Seven of the policies described the location of the property as on Lots 13 to 20, inclusive, in Block 3, and five of the policies described the location of the property as on Lots 13 to 28, inclusive. The original building and the addition thereto were located on Lots 14 to 17 and Lots 24 to 27 in Block 3, and the Gymnasium was located on Lots 18 to 23, inclusive, in Block 3. It is obvious that the description of the location in seven of the policies was inaccurate and incomplete, and the description of the location in five of the policies included lots on which only the Gymnasium was located. It is also apparent that the description of the roof was inaccurate in some of the policies, and that none of them properly described the Gymnasium roof.

The word "attach" means "to bind, fasten, tie, or connect, to make fast or join; * * *." The word "connect" means "to join, or fasten together, as by something intervening * * *." Webster's New International Dictionary, 2d Ed. The word "communicate," as used in the "additions" clause of the policies quoted above, means to connect by a door, opening or passageway. Here, the two-story brick building and the Gymnasium were connected by a permanent, enclosed passageway, firmly connected to both buildings, each building communicating with the other by means of such passageway. They were also connected by a steam line, a hot water line, an electric power line and a common sewer, serving both buildings. Moreover, both buildings were used for an integrated high school program of education, each complementing the other for those purposes.

■ The fact that the Gymnasium was a large structure does not militate against it being regarded as an addition.

1. East & West Ins. Co. v. Fidel, 10 Cir., 49 F.2d 35, 38; Queens Ins. Co. v. Meyer Milling Co., 8 Cir., 43 F.2d 885, 887; Marsh v. Concord Mut. Fire Ins. Co., 71 N.H. 253, 51 A. 898; General Accident, Fire & Life Assur. Corporation v. Cohen, 73 Colo. 459, 216 P. 522, 524.

2. Queens Ins. Co. v. Meyer Milling Co., 8 Cir., 43 F.2d 885, 887; East & West Ins. Co. v. Fidel, 10 Cir., 49 F.2d 35, 38;

Day v. Equitable Life Assur. Soc. of the United States, 10 Cir., 83 F.2d 147, 149; Liverpool & London & Globe Ins. Co. v. Kearney, 180 U.S. 132, 136, 21 S.Ct. 326, 45 L.Ed. 460; Connecticut Fire Ins. Co. v. Colorado Leasing, Mining & Milling Co., 50 Colo. 424, 116 P. 154, 160; Royal Indemnity Co. v. Markley, 116 Colo. 84, 178 P.2d 672, 674; Columbian Nat. Life Ins. Co. v. McClain, 115 Colo. 458, 174 P.2d 348, 350, 169 A.L.R. 278.

There is nothing in the language of the policies limiting the size of additions.[3]

We conclude that the policy in suit, which was in force when the Gymnasium was under construction and at the time of its completion, and that the eleven policies in force at the time the Gymnasium was under construction and at the time of its completion, of which eleven of the policies in suit were renewals, by virtue of the "additions" clauses therein covered the Gymnasium as an addition. While we have found no Colorado decisions passing on the question, our conclusion is supported by well considered cases in other jurisdictions.[4]

 While the eleven policies in suit, which were issued subsequent to the completion of the Gymnasium, were technically new insurance contracts, the agents of the Insurance Companies and the District clearly intended them to be renewals of the policies which immediately preceded them, and that fact was indicated by endorsement on such eleven policies in suit. Such policies were a part of a continuous insurance coverage. When a renewal policy is issued, it is presumed, unless a contrary intention appears, that the parties intended to adopt in the renewal policy the terms, conditions and coverage of the expiring policies.[5]

The policies in force at the time when the Gymnasium was completed, by virtue of the "additions" provision therein, covered the Gymnasium when it was completed as effectively as if it had been described in the principal coverage clause.

It follows that when the renewal policies were issued, the parties not having agreed to the contrary, it must be presumed that they intended the renewal policies would embrace the same terms and conditions and provide the same coverage embraced within the expiring policies.

It is true that the "additions" clause in the eleven policies in suit, issued after the time the Gymnasium was completed, if literally construed, would apply only to future additions, but the agents of the Insurance Companies, when they issued the renewal policies, did not advise the District that such policies would not effect the same coverage as the expiring policies which they renewed and we do not think a literal construction of the "additions" clause should be permitted to overcome the presumed intention of the parties that the renewal policies should provide the same coverage as the expiring policies.

We are of the opinion that the case of East & West Ins. Co. v. Fidel, 10 Cir., 49 F.2d 35 is clearly distinguishable from the instant case. There, the policy in question did not contain an "additions" clause, but only an "alteration and repair permit" clause and it was not a renewal of a preceding policy.

We conclude that under the existing facts and circumstances and the applicable principles of law, the trial court was justified in finding that the coverage of the policies in suit included the Gymnasium.

3. East & West Ins. Co. v. Fidel, 10 Cir., 49 F.2d 35, 37; Ayers v. Palatine Ins. Co., 234 N.Y. 334, 137 N.E. 608, 609.

4. Shepard v. Germania Fire Ins. Co., 165 Mich. 172, 130 N.W. 626, 627, 33 L.R.A., N.S., 156; Guthrie Laundry Co. v. Northern Assurance Co., 17 Okl. 571, 87 P. 649; Frohlich v. National Union Fire Ins. Co., 327 Mich. 653, 42 N.W.2d 657, 19 A.L.R.2d 604; Montana Stables v. Union Assur. Society, 53 Wash. 274, 101 P. 882; Interstate Fire Ins. Co. v. Nelson, 105 Miss. 437, 62 So. 425, 426; Queen Ins. Co. v. Delta Gin Co., 210 Miss. 167, 48 So.2d 866, 867; Old Colony Ins. Co. v. Hardaway, Texas Civ.App., 14 S.W.2d 372.

5. Lumbermen's Ins. Co. v. Heiner, 74 Ariz. 152, 245 P.2d 415, 418; American Ins. Co. v. Maddox, Tex.Civ.App., 60 S.W.2d 1074, 1075; Schmidt v. Agricultural Ins. Co., 190 Minn. 585, 252 N.W. 671, 673; Schock v. Penn. Tp. Mut. Fire Ins. Ass'n, 148 Pa.Super. 77, 24 A.2d 741, 743; Ouachita Parish Police Jury v. Northern Ins. Co., La.App., 176 So. 639, 641; Massachusetts Bonding & Ins. Co. v. R. E. Parsons Electric Co., 8 Cir., 61 F.2d 264, 268, 92 A.L.R. 218; Note 92 A.L.R. 239e.

Under the provisions of the policies, the Insurance Companies had 60 days after the amount of loss was ascertained by agreement of the parties to make payment thereof. The court awarded interest beginning 60 days after the date the amount was so ascertained.

'35 C.S.A. c. 88, § 2, in part provides:

"Creditors shall be allowed to receive interest * * * for all moneys after they become due, on any bill, bond, promissory note or other instrument [in] writing * * *."

The District was entitled to recover interest only from the date payment of the loss became due.[6]

The judgment is accordingly affirmed.

6. Young v. Kimber, 44 Colo. 448, 98 P. 1132, 1133–1134, 28 L.R.A.,N.S., 626.