David E. BOSWELL, an individual, d/b/a Boswell Construction Company, and United Pacific Insurance Company, Appellants,

v.

G. F. CHAPEL, Appellee.

No. 6775.

United States Court of Appeals
Tenth Circuit.

Dec. 19, 1961.

John J. Duhigg, Albuquerque, N. M. (Sheehan, Duhigg & Christensen, Albuquerque, N. M., on the brief), for appellants.

David R. Gallagher, Albuquerque, N. M. (McAtee, Toulouse, Marchiondo, Ruud & Gallagher, Albuquerque, N. M., on the brief), for appellee.

Before LEWIS and BREITENSTEIN, Circuit Judges, and CHRISTENSON, District Judge.

CHRISTENSON, District Judge.

In this Miller Act [1] case the sole question is the interpretation of a subcontract which the prime contractor, David E. Boswell, asserts obligated the subcontractor, G. F. Chapel, to pay for "protective services" furnished by the Atchison, Topeka, and Santa Fe Railway Company. The appellant Boswell [2] and the appellee Chapel hereinafter will be referred to by their surnames, and the railway company as such.

This action initially was brought against Boswell by the United States of America for the use and benefit of the railway company to recover the cost of protecting tracks and providing services of watchmen, flagmen, supervisors, and

---

1. 40 U.S.C.A. § 270a et seq.

2. The United Pacific Insurance Company also joined in the notice of appeal, which appeal, however, has been further prosecuted in the name of Boswell only. This opinion is dispositive of the case as to both appellants.

other protective services made necessary by the tunneling and the laying of culverts underneath the railroad pursuant to the contract between Boswell and the Bureau of Reclamation for channelization work on the Rio Grande River in Socorro County, New Mexico. This contract included a provision that the contractor would enter into an agreement with the railway company for such protection of trains while work on the railroad right of way was being carried on.

The trial court entered judgment against Boswell and in favor of the railroad company for the sum of $17,550.34, which judgment is not here in dispute. Chapel had subcontracted with Boswell to furnish specified work and material in the tunneling for, and the installation of, the culverts. By third-party complaint Boswell sought judgment over against Chapel for any amount awarded to the railway company on the theory that Chapel by his subcontract had undertaken not only to do the actual construction and installation work under the railroad, but also to pay for the protective services. It is from the judgment of the trial court dismissing Boswell's third-party complaint against Chapel that this appeal was taken.

The contract between Boswell and the Bureau of Reclamation required the clearing of trees and vegetation, and various excavation, construction and installations in the channelization of the river. Among the work to be accomplished was the installation of "tunnel liner plate culverts under the railroad tracks." With respect to this work paragraph 31 of the specifications under the principal contract provided:

"31. Construction of railroad crossings. Crossings under the tracks of the Atchinson, (sic) Topeka, and Santa Fe Railroad * * * shall be constructed in accordance with these specifications and as shown on the drawings. The contractor shall furnish all labor, equipment, and materials; shall construct all necessary false work, cribbing, or temporary construction required for the support of the railroad tracks and embankment during the construction of the crossings, and shall provide the services of any watchmen or flagmen required by the railroad company during the period of time required for the construction of the portion of the work on railroad right-of-way. All of the operations of the contractor in constructing the portion of the work under the tracks of the railroad shall be subject to the approval of the railroad company. Before beginning work on railroad right-of-way, the contractor shall enter into any agreements required and shall furnish any bonds and/or public liability and property damage insurance required by the railroad company for its protection * * *

"All operations and payments for constructing the crossings shall be in accordance with the provisions of paragraph 61. No direct payment will be made for furnishing bonds and/or insurance or for providing the services of watchmen or flagmen, and the cost thereof shall be included in the price bid for constructing the crossings."

The subcontract between Boswell and Chapel is dated December 10, 1957, about a month after execution of the principal contract. Chapel agreed to, "do and perform for the Party of the Second Part (Boswell) the work as required by principal contract to complete the following items listed in 'Bid Schedule' of the principal contract at the prices listed below opposite each item." Then followed a specification of twelve items, with the price to be paid for each. These items referred to such things as the furnishings, placing and installation of described materials and equipment for the construction of the conduits under the railroad. The subcontract recited that Chapel had read and was familiar with, "the terms and conditions of said principal contract and is willing to undertake the work of constructing bid items 1, 12, 13, 14, 15, 16, 17, 23, 24, 25, 26, and 38 of principal contract as Subcontractor * * *," and

it was agreed among other things between Boswell and Chapel:

"Second, that Party of the First Part (Chapel) will be and is hereby bound by each and every term, condition, and penalty of said principal contract in the performance of its portion of said work outlined above, and for that purpose the parties hereto agree that such terms, conditions, and penalties are made a part hereof;

"Third, that the Party of the First Part (Chapel) will forthwith at its own sole cost and expense furnish to and for the full protection of the Party of the Second Part (Boswell) and for the protection also of the Party of the First Part, and all other subcontractors (sic) engaged in the work of construction of said principal contract, full insurance in an acceptable insurance company for and against the penalties imposed under the Workmen's Compensation Act of the State of New Mexico, and under any statute or by common law for personal injuries and property damage in connection with the performance of the work to be performed hereunder;

"Fourth, that the Party of the First Part will not sublet or contract any of the work outlined above without written consent and approval of the Party of the Second Part;

"Fifth, that the Party of the Second Part will furnish all insurance required by the Santa Fe Railroad in performance of this contract;"

No mention was made in the subcontract of the services of watchmen and flagmen or other protective services to be furnished under the direction of the railroad company in accordance with the terms of the principal contract.

About ten days after the date of Chapel's subcontract, without any consultation with Chapel or any negotiations between Chapel and the railway company, Boswell entered into another contract directly with the railway com-

pany, delegating the furnishing of the protective services to the railway company itself in the following terms:

"G. *Protective Services.* Contractor (Boswell) shall bear and pay all costs of protecting Santa Fe property and traffic made necessary or occasioned by Contractor's operations under this contract. Santa Fe will furnish, at the sole cost and expense of Contractor, such flagmen, supervisors, section or bridge workmen as, in the judgment of Santa Fe, are required to insure the safety and continuity of rail traffic during Contractor's operations on or about Santa Fe property. Santa Fe personnel while assigned to such protective services at the project shall be and remain the sole employees of Contractor. All flagging and protective services shall be performed strictly in accordance with the directives and instructions issued by Santa Fe."

This contract with the railway company further provided in effect that Boswell would furnish reimbursement for the cost of all services and materials supplied to, and work performed for, Boswell within thirty days after the receipt of bills therefor; and there was a formula outlined for the computation of such costs. Indemnification and insurance protection for the railway company also was agreed upon between the railway company and Boswell.

In an attempt to demonstrate that Chapel's subcontract obligated him to pay for the protective services, Boswell points to paragraph "Second" thereof, reciting that Chapel was bound by the terms of the principal contract, and to the "Fifth" provision, to the effect that Boswell would furnish all insurance required by the railway company. But the adoption of the terms of the principal contract by the second paragraph of Chapel's subcontract was made to relate expressly to, "the performance of its (Chapel's) portion of said work outlined above." It already has been observed that the work "outlined above" was limited to specific

items, not including the protective services.

The requirement that Boswell, and not Chapel, should furnish the insurance required by the Santa Fe Railroad we believe does not justify the inference now sought to be drawn by Boswell. More clearly it indicates a purpose to make sure that even though pursuant to paragraph second of his subcontract Chapel had to furnish, "all insurance * * * for personal injuries or property damage in connection with the performance of the work to be performed hereunder," this requirement did not extend to insurance or other requirements of the principal contract for the protection of the Santa Fe Railroad, for which Chapel had assumed no obligation.

█ Appellant says that since Chapel admittedly drafted the subcontract ambiguities should be construed against him, citing East & West Ins. Co. of New Haven, Conn. v. Fidel, 49 F.2d 35 (10 Cir.1931); Ulmann v. Sunset-McKee Company, 221 F.2d 128 (9 Cir.1955); Hurd v. Illinois Bell Telephone Company, 136 F.Supp. 125 (D.C.N.D.Ill.1955), aff'd. 234 F.2d 942 (7 Cir.1956), cert. den. 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124, reh. den. 352 U.S. 977, 77 S.Ct. 352, 1 L.Ed.2d 329, and other district court cases. In the Fidel case this court noted that a strained construction of a contract should not be resorted to for the purpose of establishing an ambiguity for resolution against the drafter. In the Hurd case the rule relied upon by appellant is referred to as a secondary aid to be invoked after ordinary interpretive guides have been exhausted and there remain two or more reasonable interpretations of the language in question. The other cases cited are not inconsistent with this view.

██ The trial court did not regard the subcontract as ambiguous,[3] nor do

we. Nonetheless, should resort to interpretive aids be had, the finding of the trial court still would be amply supported, giving due weight to the fact that Chapel drafted the subcontract. Where the interpretation of language in a contract is dependent upon extrinsic evidence, the trial court's findings are conclusive where supported by substantial evidence representing the more reasonable alternatives upon the whole record. Evensen v. Pubco Petroleum Corporation, 274 F.2d 866 (10 Cir. 1960); Dow v. United States, for Use and Benefit of Holley, 154 F.2d 707 (10 Cir. 1946).

█ The subcontract was practically construed and acted upon by both parties consistently with the idea that Boswell, and not Chapel, was required to arrange for the protective services with the railway company. Where parties have accorded a practical construction to their contract by their conduct, " * * * this construction will be given substantial weight in determining the proper interpretation, particularly if the conduct manifesting their construction occurred prior to any controversy." Fanderlik-Locke Co. v. United States, 285 F.2d 939, 947 (10 Cir.1960) cert. den. 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed. 2d 823. Boswell admitted that his bid to the government included an amount representing the protective services he was obliged to perform for the railway company in addition to the items contracted by Chapel. Chapel in no way concerned himself with these protective services. On the contrary, Boswell, without consulting Chapel, directly contracted with the railway company for the performance by the latter of his obligation with respect to protective services and followed through the details of the execution of this contract without reference to Chapel.

Affirmed.

---

**3.** Finding X: "That there was no agreement, express or implied, between defendant and third party defendant to the effect that the third party defendant was required to pay for said protective services or any part thereof." In the course of the trial the Court indicated the view that, "The contract speaks for itself."