No. 12,728.

HINKLE *v.* BLINN.
(19 P. [2d] 1038)

Decided March 6, 1933.

Mr. GILBERT A. WALKER, for plaintiff in error.

No appearance for defendant in error.

*In Department.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

IN an action begun before a justice of the peace, tried on appeal in the county court, Blinn had judgment for $300. Hinkle assigns error.

It fairly appears from the evidence (there were no written pleadings) that in January, 1928, Blinn leased a ranch to Hinkle, for a period of one year commencing March 1, with privilege to Hinkle of an additional year, which he exercised; that the rental reserved was $350 per annum, "to be paid," as set forth in the lease, "by furnishing milk and cream to the first party; that the first party is to retain one-third of the checks for the milk and cream delivered each month to apply on the rent to be paid until the full amount of rent shall have been paid in that manner; the other checks, after the one-third has been retained shall be turned over to the second party each month." The lease is silent as to the quantity of milk and cream to be supplied monthly, as well as for the whole period, and the price to be allowed is not stated, but logically the parties must have intended the total value of the products, at some price, would in one year equal a sum not less than three times the reserved rental for the period. It was established by the testimony that orally the parties agreed the allowance for sweet milk should be 20 cents per gallon for June, July and August, and 25 cents for other months, and for sweet cream 50 cents per quart throughout the year, and

on that basis the parties apparently acted until December, 1928, when Blinn refused to receive milk or cream from Hinkle. Another point not covered in the lease, but which finally rose to plague, was as to whether the product was to consist solely of sweet milk and cream. It appears that occasionally Hinkle had sour cream for sale, a product always marketable, but less profitable to the producer than sweet milk and cream, and this, although there were other buyers, he invariably took to Blinn, who, until the disagreement in December, already mentioned, bought it at the market price and made payment in cash, claiming no part thereof on account of rental.

We conclude that the conduct of the parties before the controversy arose, acting under the contract, is a reliable test of their interpretation of the instrument, and whatever the stress of subsequent disagreement, neither in his own interest may be heard to urge a different construction. *North Boulder Farmers' Ditch Co. v. Leggett Ditch and Reservoir Co.,* 63 Colo. 522, 168 Pac. 742; *New Brantner Ditch Co. v. Kramer,* 57 Colo. 218, 141 Pac. 498; *Lovell v. Goss,* 45 Colo. 304, 101 Pac. 72; *Cohen v. Clayton Co.,* 86 Colo. 270, 281 Pac. 111; *Illinois Building Co. v. Patterson,* 91 Colo. 391, 15 P. (2d) 699; *Thompson v. Sweet,* 91 Colo. 552, 17 P. (2d) 308; 6 R. C. L. 853. "In construing a contract, the court will follow the construction placed upon it by the parties themselves." *Buckhorn Co. v. Consolidated Co.,* 47 Colo. 516, 529, 108 Pac. 27. In that view Blinn could not under the lease claim any part of the sour cream proceeds. But we do not find that Hinkle counterclaimed in relation to the item, and the court probably took it into account in determining the controversy as far as the first year was involved, to which only incidental attention was apparently given, for the principal controversy had to do with the second year, during which there was no delivery of milk, hence no disagreement about credits.

Assuming that the court made its award on the

second year's occupancy of the leased premises, we come to the question of whether, the circumstances considered, Blinn was entitled to have a money judgment. The testimony is clear that in August of the second year Blinn, accompanied by his counsel, went to the ranch and demanded of Hinkle that he make settlement for the rental, and that in the course of the discussion Hinkle called attention to the provision of the lease calling for payment in milk and offered to make delivery of as much sweet milk, 15 gallons per day or more, and cream, as Blinn could use, until the rent was fully paid. It further appeared that Hinkle was able, as well as willing, to do what he proffered. In such connection we regard as significant, although of course not controlling, that at such conference, held at the instance of Blinn, his own counsel advised him to accept Hinkle's offer to pay in milk and cream, as provided in the lease. Blinn's excuse is that in December, 1928, when he refused to receive milk and cream, and which he claimed justified his further refusal in 1929, he based it upon tests which he had caused to be made of Hinkle's product, which showed, as Blinn asserts, deficiency of butter fat. It is not claimed that the tests were made in the presence of Hinkle, and on an occasion when Hinkle was to witness a test the lactometer supplied by Blinn was dropped by his employee and broken, and the test was not made. Hinkle and his wife testified that their cows were shorthorns and jerseys, apparently recognized as superior dairy cows, and were in good health and condition, and the milk delivered to Blinn was as it came from the cows. These statements were not controverted.

When we consider the record generally, and that for nearly a year the parties had no misunderstanding, Hinkle's product being received by Blinn and credit given as contemplated in the lease; that the alleged tests were secretly made, and Blinn would not thereafter consider accepting milk and cream in payment, we are persuaded that Blinn simply did not need or require milk

from Hinkle, being supplied to the extent of his demands from others with whom he was under contract, and therefore concluded, first, to cancel the lease at the end of the first year, failing which, as resulted, to insist on payment other than as provided. This, we think, may not be justified in law. He contracted to receive payment in milk and cream, and the promisor, shown to be able to do so, offered to make delivery as agreed. It follows that the court erred, and the judgment is reversed.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE CAMPBELL concur.