466 P.2d 101

**C. E. HOPPER, Plaintiff-Appellant,**

v.

**Benjamin Lee REYNOLDS and Lou Ellen Reynolds, his wife, Defendants-Appellees.**

**No. 8871.**

Supreme Court of New Mexico.

March 9, 1970.

Ellis J. French, Albuquerque, for plaintiff-appellant.

Richard B. Addis, Albuquerque, for defendants-appellees.

## OPINION

OMAN, Judge, Court of Appeals.

Plaintiff appeals from a judgment dismissing his complaint after trial. We affirm.

The facts are:

(1) On March 22, 1957, plaintiff and his wife, as purchasers, entered into a "Real Estate Contract" with Vivian R. Hedman, as owner, whereby Hedman agreed to sell and the Hoppers agreed to purchase two improved lots in the City of Albuquerque. This contract, which will hereinafter be referred to as the Hedman-Hopper contract, was largely a printed contract form used extensively in Bernalillo County.

This printed form provides for a down payment, in an amount to be written therein, and payment of the balance of the purchase price and interest thereon in the amounts and manner to be designated. The purchaser is entitled to take possession of the premises, but is obligated to keep the buildings insured, pay all taxes and assessments, and make all street improvements levied or ordered by lawful authority. It is provided that a copy of the contract be placed in escrow, together with a warranty deed from the owner to the purchaser and a special warranty deed from the purchaser to the owner re-conveying the property.

Paragraphs 8 and 9 of the contract provide:

"8. It is mutually agreed that time is the essence of this contract. Should the Purchaser fail to make any of the said payments at the respective times herein specified, or fail or refuse to repay any sums advanced by the Owner under the provisions of the foregoing paragraph, or fail or refuse to pay said taxes, assessments or other charges against said real estate and continue in default for *thirty (30)* days after written demand for such payments, or payment of taxes or payment of assessments or other charges against said real estate, or repayment of sums advanced under provi-

sions of the foregoing paragraph has been mailed to the Purchaser addressed to *them* at *3512 Valencia NE, Albuquerque, New Mexico* Then the Owner may, at his option, either declare the whole amount remaining unpaid to be then due and proceed to enforce the payment of the same; or he may terminate this contract and retain all sums theretofore paid hereunder as rental to that date for the use of said premises, and all rights of the Purchaser in the premises herein described shall thereupon cease and terminate and *they* shall thereafter be deemed a tenant holding over after the expiration of *their* term without permission. An affidavit made by said Owner or his agent showing such default and forfeiture and recorded in the County Clerk's office shall be conclusive proof, in favor of any subsequent bona fide purchaser or encumbrance for value, of such default and forfeiture; and the Purchaser hereby irrevocably authorizes the Owner or his agent to thus declare and record such default and forfeiture, and agrees to be bound by such declarations as *their* act and deed.

"9. Said Purchaser shall be entitled to take possession of said real estate and retain possession thereof until this contract shall be terminated by the exercise of the Owner of the option above provided, or until the delivery by the hereinafter named escrow agent, back to the Owner of all the papers held in escrow herewith, but the legal title to said real estate shall remain in said Owner until this contract has been fully performed upon the part of the Purchaser and deed executed and delivered as hereinbefore specified."

The emphasized portions were inserted by the parties in the blanks provided in the printed form.

(2) On October 21, 1958, and January 11, 1959, Hedman personally wrote the Hoppers demanding payments of installments due on their contract and notifying the Hoppers:

"* * * that if you fail to make payments due on the contract within thirty days of this demand, it is my declaration that the contract be terminated, and all sums theretofore paid hereunder as rental to that date for the use of said premises."

(3) On September 4 and 18, 1957, and on April 15, 1958, Hedman's attorney wrote letters to the Hoppers demanding payment of delinquent installments under their contract. In each of these letters the Hoppers were notified:

"* * * that if you fail to make all payments due on the contract within thirty days of this demand, then the Owner [Hedman] will either declare the whole amount remaining unpaid to be then due and proceed to enforce the payment of the same or terminate this contract and retain all sums theretofore paid hereunder as rental to that date for the use of said premises, and all rights of the purchaser [Hoppers] in the premises herein described shall thereupon cease and terminate."

(4) On February 25, 1964, the Hoppers, as owners, entered into a "Real Estate Contract" with defendants, whereby the Hoppers agreed to sell the said lots to defendants. This contract, referred to as the Hopper-Reynolds contract, was prepared on a printed form identical to that used in the Hedman-Hopper contract. Paragraph 8 of these is the same, except for the change in address to which written demands should be mailed, and the addition at the end thereof in the Hopper-Reynolds contract of the following typed language: "Purchasers agree to pay $25 to the owner or his attorney for each default letter."

(5) On June 5, August 20 and October 21, 1964, and on February 21 and March 22, 1965, the Hoppers wrote the Reynolds [Defendants] letters demanding delinquent payments under their contract. In each of these letters, which were signed by both plaintiff and his wife, defendants were:

"* * * notified that if you [defendants] fail to make this payment within

thirty days of the date of this demand, then the owner [Hoppers] will either declare the whole amount remaining unpaid to be then due and proceed to enforce the payment of same or terminate this contract and retain all sums theretofore paid hereunder as rental to that date for the use of said premises, and all rights of the purchaser [defendants] in the premises herein described shall thereupon cease and terminate."

(6) On July 12, 1965, defendants assigned their interest in their contract with the Hoppers to a Mr. Hurley.

(7) On July 31, 1965, Mrs. Hopper assigned her interest to her husband [plaintiff].

(8) On December 21, 1965, an attorney for the Hoppers wrote defendants demanding past due payments and advising that unless these payments were made:

"* * * within 30 days, the undersigned owners, C. E. Hopper and Lucille Hopper, his wife, shall exercise their default option under Paragraph 8 of said contract."

(9) On January 12, June 10, September 27 and October 24, 1966, the Hoppers had another attorney write letters of demand for them to defendants. In each of these letters, a carbon copy of which was forwarded by the attorney to plaintiff, the defendants were notified that unless the delinquencies were paid within thirty days, "* * * Mr. and Mrs. Hopper will take the action provided for in paragraph 8 of the subject contract."

Defendants and their assignee made payments under the contract to and including the monthly payment due on August 10, 1966.

(10) On November 7, 1966, Hedman assigned her interest in the Hedman-Hopper contract to L. G. Hopper and his wife, parents of plaintiff. She also executed a quitclaim deed conveying her interest in the property to Mr. and Mrs. L. G. Hopper, who paid her the unpaid balance under the Hedman-Hopper contract.

(11) On November 8, 1966, the attorney, who had written the demand letters referred to in Paragraph 9 above, wrote a demand letter to plaintiff and his wife on behalf of plaintiff's parents. This letter called attention to the Hedman-Hopper contract; advised of the assignment by Mrs. Hedman of all her interest in the contract and the land to plaintiff's parents; advised of the delinquent payments for the months of September and October under the contract; demanded that all delinquent payments under the contract be made within thirty days; and advised that unless they were made "* * * Mr. and Mrs. L. G. Hopper will take the action provided for in Paragraph Eight of the subject contract."

(12) On November 30, 1966, plaintiff filed his complaint in this cause to which he attached a copy of the Hopper-Reynolds contract. He alleged in Paragraphs V and VI of his complaint:

"V"

"That it was covenanted and agreed in and by the said real estate contract that the whole principal sum should become due at the option of the vendor, his executors, administrators, and assigns, after default in the payment of any installment of principal or of interest for thirty (30) days, after demand for the same.

"That the Defendant has failed to comply with the condition of said real estate contract by omitting to pay the installments of principal and interest which became due thereon; and that prior to the commencement of this action more than sixty (60) days had elapsed since said principal installment and interest became due and payable.

"VI"

"That the Plaintiff, pursuant to the provisions of said real estate contract, has elected and does elect that the whole principal sum secured by said purchaser be immediately due and payable."

(13) On December 9, 1966, Mr. and Mrs. L. G. Hopper demanded and received from the escrow agent the deeds held in escrow under the Hedman-Hopper contract. They had the special warranty deed recorded on December 19, 1966.

(14) On December 10, 1966, L. G. Hopper, according to his affidavit recorded on December 13, 1966, received a quitclaim deed from plaintiff and "repossessed" the premises.

(15) On December 21, 1966, defendants' attorney filed an appearance in this case. An answer to the complaint was filed by defendants on January 10, 1967.

(16) The case was tried on October 14, 1968.

In his opening statement to the court, defendants' attorney stated that in his opinion the plaintiff's suit was one for specific performance, that plaintiff was in no position to convey title to defendants, and for this reason plaintiff must fail.

Plaintiff's attorney, immediately before calling plaintiff as the first witness, stated to the court, " * * * this is a case in equity * * *."

Plaintiff testified that he waited: " * * * thirty days for the second demand letter [the one of October 24, 1966] and then I turned the case over to you [Mr. Horton, who represented plaintiff in the trial below] for collection to demand full payment." He also testified:

"Q. All right. Now let's see here, now in these letters, either written by you or by your attorney [letters of June 5, 1964, March 22, 1965, and September 27 and October 24, 1966] * * *

" * * *.

"MR. HORTON: * * * Did you refer to paragraph eight? [Of the contract]

"A. Yes, I did.

"Q. In which you demanded recovery and then in your complaint for the suit, this suit that we are in here today on and the complaint against Mr. Reynolds, at that time did you elect not only orally but in the complaint itself, when you sued for the payment, did you elect which way you were going to go as far as whether you were going to take the property back or whether you were going to sue for the unpaid—the purchase price?

"A. Yes, I made the election to demand the complete balance of full payment.

"Q. In your complaint—

"MR. ADDIS: May I interrupt and ask that the question be read back? Would you please read the question back, I wasn't quite sure I understood it.

(Question read by the reporter)

"MR. HORTON: And then you replied, as I understand it, you did elect to sue for the purchase price?

"A. The unpaid balance, yes."

(17) After the noon recess and after plaintiff had presented most of his evidence in support of his case, he moved for leave:

" * * * to amend his complaint to plead in the alternative to the demand for performance under this contract, that in the event that the Court would feel that it would be impossible to order a specific performance * * * in view of the fact that now the plaintiff has been dispossessed of his property, that in the alternative, the plaintiff be allowed to sue for damages for the breach of the contract for the amount of his loss, which is $17,043.00, plus six per cent interest for two years."

[$17,043.93 was the full amount of the unpaid purchase price under the Hopper-Reynolds contract].

The court reserved a ruling on the oral motion and the trial proceeded. In its conclusions of law the trial court expressly denied the motion to amend, and it also denied a requested finding by plaintiff that he should be allowed to amend.

■ Plaintiff now urges his primary remedy was for breach of contract, and the trial court erred in ruling he was not enti-

tled to any relief under the allegations of his complaint or the evidence adduced at the trial.

We are of the opinion that plaintiff must fail in his contention, because the case was tried and decided on the theory of plaintiff's right to specific performance of the Hopper-Reynolds contract.

In his complaint plaintiff was obviously seeking the relief provided under the first option of Paragraph 8 of the contract as quoted above. The question of his right to maintain suit for this relief is identical with the question presented in Hilger v. Cotter, 75 N.M. 699, 410 P.2d 411 (1966). In that case we said a cause of action for the unpaid balance of the purchase price under the contract was in effect an action for specific performance. To this same effect see 8A Thompson on Real Property, § 4476 at 436 and § 4479 (J. Grimes 1963 Repl.). Since plaintiff was in no position to perform on his part, he could not maintain his suit. Hilger v. Cotter, supra; 8A Thompson on Real Property, supra, §§ 4479 and 4480.

The question then presented is whether the trial court properly denied the oral motion to amend the complaint to add a count in damages for breach. As above stated, this motion was made after plaintiff had presented most of his evidence in support of his claim for the remainder of the purchase price pursuant to his election of this option provided in Paragraph 8. By his motion to amend, he sought to recover as damages an amount equal to the unpaid balance of the purchase price.

Even if there be a difference between what plaintiff sought under his complaint and by his motion, we are of the opinion he must fail, because his remedies, under the facts in this case, were limited to the two options expressly provided in Paragraph 8 of the contract.

Plaintiff argues that defendants were advised prior to their entry into the contract that he was not able to pay the $100.-00 monthly installments on the Hedman-Hopper contract, and that, if defendants defaulted, he "* * * would have to demand full payment because [he] couldn't afford to take it [the property] back any more," and Mr. Reynolds stated: "Well, you don't have to worry about that this time." The realtor representing plaintiff also testified he told Mr. Reynolds that if he failed to make payments the plaintiff would not take the property back, and since plaintiff could not take it back his only alternative would be to sue for the purchase price.

Plaintiff argues from these statements to Mr. Reynolds: "Thus, prior to the execution of the contract appellees [defendants] had notice that the appellant [plaintiff] would hold them for damages for breach of their promises; * * *" We fail to understand how these statements by plaintiff and the realtor to Mr. Reynolds could suggest anything more than an intention by plaintiff and his wife to rely on the very option provided in Paragraph 8, which they repeatedly stated they would rely on, and which plaintiff elected and relied upon in bringing this suit.

At no time, until the making of his oral motion after presenting most of his evidence in support of his claim for the unpaid purchase price, was it ever suggested that plaintiff, or any one acting on his behalf, contemplated any remedy for breach of the contract, other than the optional remedies provided in Paragraph 8. Defendants take the position that these remedies were exclusive.

The authorities seem to be in discord as to the rules of construction applicable in determining whether the parties to a contract intended a particular remedy or remedies stipulated therein to be exclusive of other remedies ordinarily available under the law. See Annot., 84 A.L.R.2d 322 (1962) and particularly §§ 2 and 3 and the cases cited thereunder. We are of the opinion that the question of exclusiveness "* * * turns upon the intention of the parties as revealed by the language of the contract as a whole, the specific provisions relating to the remedy, and all the facts of a particular case, such as the background

of the contract when executed, the conduct of the parties, and the nature of the subject matter involved." Annot., supra, 324.

This rule of interpretation is consistent with the fundamental concept of a contract as an agreement, in which the parties may ordinarily agree upon a remedy or remedies for the breach thereof. Schminke Milling Co. v. Diamond Bros., 99 F.2d 467 (8th Cir.1938); United States for Use and Benefit of Armco Drainage & Metal Products, Inc. v. Vander Heyden, 158 F.Supp. 930 (S.D.Ill.1958); Zancanaro v. Cross, 85 Ariz. 394, 339 P.2d 746 (1959). It is also consistent with the principle that it is not the province of the court to alter or amend the contract, but rather to interpret and enforce the contract as made by the parties. Brown v. American Bank of Commerce, 79 N.M. 222, 441 P.2d 751 (1968); Davis v. Merrick, 66 N.M. 226, 345 P.2d 1042 (1959)

While the language of the contract, and particularly the language of Paragraph 8, neither expressly limits the remedies to the options provided in said paragraph nor suggests they are not to be considered as exclusive remedies, these remedies are identical with those provided in the Hedman-Hopper contract, to which plaintiff was a party. These remedies had been specifically called to his attention by letter on at least five occasions prior to the execution of the Hopper-Reynolds contract.

Although it was not necessary that the remedies for breach of the Hopper-Reynolds contract be the same as those for breach of the Hedman-Hopper contract, their identity would be advantageous, since defendants had agreed to perform the obligations of the purchaser [plaintiff and wife] under the Hedman-Hopper contract, and plaintiff was still bound to perform these obligations. Compare Kathman v. Wakeling, 69 Wash.2d 195, 417 P.2d 840 (1966), in which two successive contracts were also involved and in which the court found the remedies specified in the contract to be exclusive, even though, under Washington's rule of construction,

" * * * a remedy specified in a contract is to be considered permissive rather than exclusive, unless so provided in the contract either expressly or by necessary implication."

Plaintiff was familiar with the contract form and the remedies provided in Paragraph 8 at the time he entered into the contract with defendants. He and his realtor both advised Mr. Reynolds, prior to the execution of the contract, that in the event defendants should default, plaintiff would have to demand and sue for the full purchase price, which is one of the two optional remedies afforded him as owner under the contract. After the execution of the contract, plaintiff and his wife on nine occasions had expressed in their letters to defendants their intention to exercise one of the stipulated optional remedies. Plaintiff was notified by his parents that they proposed to pursue one of these remedies under the Hedman-Hopper contract. Plaintiff expressly elected to pursue one of these remedies in this suit.

In our opinion the only reasonable interpretation of Paragraph 8 of the contract, in the light of all the facts and circumstances, is that the parties intended the optional remedies stipulated therein to be exclusive. This being the case, plaintiff had no remedy for damages for breach. The remedies provided in the contract were adequate. Plaintiff could have recovered judgment against defendants thereunder for the entire unpaid purchase price, or he could have rescinded the contract, recovered the property and retained all payments made by defendants as rental. However, in order to assure himself of the full benefit of the first of these remedies, he was required to perform his obligations under the Hedman-Hopper contract, and in this he failed.

The judgment should be affirmed.

It is so ordered.

MOISE, C. J., and GEORGE L. REESE, Jr., District Judge, concur.