494 P.2d 612

**SCHULTZ & LINDSAY CONSTRUCTION CO., a North Dakota Corporation, licensed and doing business in the State of New Mexico, Plaintiff-Appellant,**

v.

**STATE of New Mexico and New Mexico State Highway Commission, Defendants-Appellees.**

No. 9305.

Supreme Court of New Mexico.

March 3, 1972.

McAtee, Marchiondo & Berry, E. Douglas Latimer, Albuquerque, for appellant.

David L. Norvell, Atty. Gen., George D. Sheldon, Sp. Asst. Atty. Gen., Santa Fe, for appellees.

## OPINION

OMAN, Justice.

This is a suit by plaintiff construction company (hereinafter called "Contractor") against the State of New Mexico and the State Highway Department (hereinafter called "State") on a highway construction contract to recover the sum of $62,630.93, plus interest, allegedly due the Contractor for extra work done pursuant to the contract. The trial court found in favor of the State and entered judgment dismissing the Contractor's complaint. The Contractor has appealed. We reverse.

The contract value of the extra work in the amount of $62,630.93 was not disputed at the trial. The State's contentions were that the failures in the cement treated base course (hereinafter called "CTBC"), which occasioned the extra work by the Contractor, were caused by breaches of the contract on the part of the Contractor, and, thus, not compensable.

It is admitted the Contractor complied with the contract requirements in regard to the making of its claim for extra compensation. It is also admitted the claim was denied on October 16, 1969. The Contractor seeks interest at 6% per annum from this date. This is consistent with the provisions of § 50-6-3, N.M.S.A.1953 (Repl. Vol. 8, pt. 1, 1962). See also Montgomery v. Cook, 76 N.M. 199, 413 P.2d 477 (1966). Coseboom v. Marshall Trust, 67 N.M. 405, 356 P.2d 117 (1960).

The contract was drafted by the State and consists of more than 400 pages. It is the function of the court to interpret and enforce the contract as made by the parties. Hopper v. Reynolds, 81 N.M. 255, 466 P.2d 101 (1970). The contract must be considered and construed as a whole, with meaning and significance given to each part in its proper context with all other parts, so as to ascertain the intention of the parties. Thigpen v. Rothwell, 81 N.M. 166, 464 P.2d 896 (1970); Brown v. American Bank of Commerce, 79 N.M. 222, 441 P.2d 751 (1968); Phillips Petroleum Co. v. McCormick, 211 F.2d 361 (10th Cir. 1954). The primary objective in construing a contract is to ascertain the intent of the parties. Leonard v. Barnes, 75 N.M. 331, 404 P.2d 292 (1965); Jones v. Palace Realty Co., 226 N.C. 303, 37 S.E.2d 906 (1946); 4 S. Williston, A Treatise on the Law of Contracts, § 601 (3rd Ed. W. Jaeger 1961).

It is logical to assume that the parties to a contract know best what is meant by its terms, and that whatever is done by them during the performance of the contract is consistent with their intent and the meaning of the contract terms as understood by them. Consequently, the construction of a contract adopted by the parties, as evidenced by their conduct and practices, is entitled to great weight, if not the controlling weight, in ascertaining their intention and their understanding of the contract. Old Colony Trust Company v. City of Omaha, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410 (1913); Hinkle v. Blinn, 92 Colo. 302, 19 P.2d 1038 (1933); Jernigan v. New Amsterdam Casualty Company, 69 N.M. 336, 367 P.2d 519 (1961); James Stewart & Co. v. Law, 149 Tex. 392, 233 S.W.2d 558 (1950); First Nat. Bank of Green River v. Ennis, 44 Wyo. 497, 14 P. 2d 201 (1932); 4 S. Williston, supra, §

623; 3 A. Corbin, Corbin on Contracts, § 558 at 257–58 (1960). This is particularly true as to the resolution of ambiguities and uncertainties of meaning in the contract [Lutterloh v. Patterson, 211 Ark. 814, 202 S.W.2d 767 (1947); Johnston v. Landucci, 21 Cal.2d 63, 130 P.2d 405 (1942); Heckard v. Park, 164 Kan. 216, 188 P.2d 926 (1948); Maffett v. Emmons, 52 N.M. 115, 192 P.2d 557 (1948); Superior Oil Co. v. Stanolind Oil & Gas Co., 150 Tex. 317, 240 S.W.2d 281 (1951)], and especially so if the conduct of the parties manifesting their construction of the contract occurred prior to the development of a controversy between them. Fanderlik-Locke Co. v. United States For Use of Morgan, 285 F. 2d 939 (10th Cir. 1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961); Hinkle v. Blinn, supra.

■ The trial court obviously did not consider the conduct and practice of the parties in construing the contract and in arriving at the intent of the parties, but concluded "* * * the issues herein are determined strictly by the terms of the contract between the parties." It is also apparent that the terms of the contract were construed strictly against the Contractor. The applicable rule requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract. Boswell v. Chapel, 298 F.2d 502 (10th Cir. 1961); East & West Ins. Co. of New Haven, Conn. v. Fidel, 49 F.2d 35 (10th Cir. 1931).

Since we are reversing a judgment in favor of the State, it would seem appropriate to acknowledge the only authority relied upon by it in this appeal as support for its position. The totality of this authority consists of the following sentence from 17 Am.Jur.2d, Contracts, § 253 at 646 (1961)—not at 446 as cited by appellee in its answer brief: "A contract should be construed liberally to protect the public interest where that is involved in the case."

The only case cited in Am.Jur.2d as authority for this statement is Public Service Co. v. City and County of Denver, 153 Colo. 396, 387 P.2d 33 (1963). That case concerned the granting of a public utilities franchise, and the stated rule was clearly confined to agreements granting such franchises. Even if we were to adopt and apply this stated principle to the facts here, it would not alter the result we reach. This stated rule of liberal construction may not properly be extended to the point of excluding or overriding all other rules of construction or to the point of working an unreasonable and unjust result.

There are obvious ambiguities, inconsistencies and uncertainties in the contract before us. The State's own witnesses placed different constructions on the two areas of performance under the contract which are here in question, and the State's project engineer, who was charged with the responsibility of seeing that the Contractor performed its obligations under the contract, construed the contract as authorizing the Contractor to do what it did in these two areas.

Although the State contended the Contractor improperly routed haul traffic over the CTBC, and this contributed to the failures therein, the trial court apparently rejected these contentions and made no findings relative thereto. No cross-appeal has been taken. Thus, we will not consider this question.

The trial court's Findings 3, 4 and 5 relate to the two areas of claimed improper performance on the part of the Contractor. These findings are:

"3. Under the contract between the parties, Plaintiff was responsible for producing a cement-treated base material mix containing sufficient water so that the material would properly set and for preventing pre-mature [sic] drying of the base in place by applying a moisture evaporation barrier which would prevent the excessive evaporation of moisture before the material had set or cured.

"4. Plaintiff knew at all material times that the cement-treated base mate-

rial mix it was producing from its pug mill was too dry and did not contain sufficient water.

"5. To seal the base in place, Plaintiff used a material which was not designed or suitable for producing a moisture escape barrier and which permitted the escape of excess moisture and, as well, permeated part of the sub base, [sic] to a depth of up to approximately one inch."

The two areas of failure on the part of the Contractor, as found by the trial court, were (1) the failure to mix with the cement and base course aggregate the proper amount of water, and (2) the use of a material on the upper surface of the CTBC unsuitable for forming a membrane or barrier which would prevent the escape of excessive amounts of moisture.

There are provisions in the contract which state the Contractor shall perform in strict accordance with the plans and specifications to the complete approval of and acceptance by the Chief Highway Engineer; all interpretations of the plans, specifications, and special provisions shall be made with regard to the requirements that only the best standard construction methods and practices are to prevail and only material and workmanship of the best quality are to be incorporated in the work; inspections made by the engineer's inspectors will not relieve the Contractor of its obligation to perform the work in accordance with the contract; all work that does not conform to the requirements of the contract shall be considered defective; defective work, whether the result of poor workmanship, use of defective materials, or damage through carelessness, found to exist prior to final acceptance of the work shall be immediately corrected to conform to plans and specifications; and the fact that an inspector may have previously overlooked such defective work shall not constitute an acceptance of any part of it.

There are also provisions to the effect that the engineer, who performs through his project engineer, inspectors and other subordinates, shall decide all questions that may arise as to the quality and acceptability of materials furnished, the work performed, and the manner of performance of the work; all questions that may arise as to the interpretation of the plans and specifications; and all questions as to the satisfactory and acceptable fulfillment of the terms of the contract. He may reject any materials which do not conform to the plans and specifications, and he may order removed and replaced at the Contractor's expense any work performed or materials furnished without inspection by him or his inspectors.

His inspectors are authorized to inspect all work performed and materials furnished, and these inspections may extend to all or any part of the work and to the preparation, fabrication, quality or manufacture of materials to be used in the work. His inspectors are required to call to the attention of the Contractor any failure of the work or materials to conform to the contract, and have the authority to reject materials or suspend the work by written order, until any questions at issue can be referred to and decided by the engineer.

The Contractor is required to abide by the decisions of the engineer; to execute promptly orders and directives issued by the engineer; and to supply such materials, equipment, tools, labor and incidentals as may be required by the engineer.

The State's position, which finds support in some of the language of the contract which it drafted, and particularly in that portion thereof entitled "Interim Specifications" consisting of 297 pages, apparently is that it has complete and total control of the performance by the Contractor, but the Contractor is responsible for all failures in the completed product, even though the failures may have been occasioned partly or entirely by error on the part of the State in the exercise of its right of control. However unjust, unconscionable and inconsistent with other portions of the contract this position may be, we are of the opinion that under the language of the contract

and under the interpretations thereof adopted by the State through its project engineer and chief inspector, the Contractor performed within the terms of the contract and is entitled to payment for the extra work.

As shown above, the engineer—in fact the project engineer—is vested with the sole power to interpret the plans and specifications and to decide all questions as to the quality and acceptability of materials furnished by the Contractor. It is the duty of the inspectors to call to the attention of the Contractor any failure of the work or materials to conform to the contract. Logic and justice require these interpretations and decisions to be made and called to the attention of the Contractor, along with any failures found by the inspectors, as the work progresses and as the materials are prepared and incorporated into the highway construction. The engineer cannot refuse to interpret and decide questions as they arise, nor can he be permitted to change his interpretations and decisions to the prejudice of the Contractor, who is obliged to accept his interpretations and decisions. Nor may an inspector, who is advised of a failure of the work or materials to conform to contract requirements, evade his responsibility to call such failure to the Contractor's attention.

Insofar as the CTBC is concerned, it was prepared by the Contractor in a pug mill. This is a mill in which the proper amounts of cement, aggregate and water are combined and mixed before being incorporated into the highway. The State specifies the percentages of cement, aggregate and water which are to be mixed to form the finished CTBC. To make sure the proper percentages of these materials are mixed, the State calibrates the mill. That is, it sets the devices by which the component parts are fed into the mixer, and these settings control the percentage of each component which goes into the finished CTBC. In the case now before us the mill was calibrated by the State's chief inspector on this project. He testified that in making the calibration he checked the accuracy of the water metering device and the equipment to make sure there was no leakage, and then made a setting which would deliver sufficient water to comply with the specifications.

Thereafter he made several tests each day to ascertain the moisture content of the CTBC. This content was consistently less than the recommended optimum of 7.5%. Although he had authority to reject any of the CTBC, and so testified, none was ever rejected. He also testified he had "control as to whether or not it [CTBC] met specifications" and that it was "within the specification limits."

The project engineer testified that pursuant to the contract and the practice it was his duty to reject any materials which did not meet specifications, and that it was his function "to insure" that the Contractor built the highway according to the plans, specifications and special provisions of the contract. He also testified the CTBC "as it was produced" met specifications; he was aware of the actual moisture content of the CTBC because he had daily reports thereof prepared under his supervision which he signed; the Contractor was permitted only to make minor changes in the moisture content without his consent; and in his judgment the failures in the CTBC, after it was put in place as a part of the highway, were due to the haul traffic over it and the failure of the asphaltic oil used to seal in the moisture.

It is true other witnesses were of the opinion the failures were due largely, if not entirely, to the lack of adequate moisture in the CTBC mix. In fact this was the opinion of the Contractor's employees, as shown by the trial court's Finding #4 above quoted. However, the State's project engineer and chief inspector interpreted the contract specifications as permitting the moisture content shown by their inspections and tests; they had the power of control over the amount of moisture used in the mix; and it was their duty to call to the Contractor's attention

any failures in the materials and to reject the CTBC if it failed to comply with specifications. If there were any mistakes or breaches of the contract in regard to the moisture content in the CTBC, they were the State's mistakes and breaches.

Although the Contractor did not agree that the CTBC contained adequate moisture, it did agree the project engineer had the power of control under the contract and that it had the duty of complying with his interpretations and decisions. Both the State and the Contractor so interpreted and understood the meaning of the contract and performed thereunder with this understanding as to the power of control by the State and the duty of compliance therewith by the Contractor.

As stated earlier herein, the question is not before us as to whether the failures in the CTBC were due in part to the haul traffic over it.

The remaining issue to be decided is whether the Contractor complied with the contract specifications in using SSO—an asphaltic oil—to seal the moisture in the CTBC until it had properly cured. Other asphaltic materials were apparently better suited for this purpose.

However, some time during the week before the Contractor began construction on this project, it notified the project engineer that it proposed to use SSO for this purpose. The engineer reviewed the specifications, determined that the SSO was one of the materials thereby provided as being acceptable for the intended use, and that the Contractor had the option under the contract of using this material for this purpose. As each load of the SSO arrived, a Loading Certificate of Test was furnished the project engineer as required by the contract. He at no time questioned the right of the Contractor to use this material, and, in fact, approved it and testified at trial that he was of the opinion the Contractor had the option under the contract to use SSO. It was not until after

failures in the CTBC had occurred that another asphaltic material was used to create the moisture retaining membrane or seal.

█ It is true another of the State's engineers, who was acting only in an advisory capacity to the project engineer, interpreted the contract specifications otherwise and stated in his opinion the project engineer had misinterpreted the specifications. However, this was an after-the-fact interpretation and by one who had actually no authority on behalf of the State in controlling the performance of the Contractor. The one person who had the authority of control, the sole power of insisting that his interpretations and decisions be followed by the Contractor, and the duty of seeing that the Contractor performed within the terms of the contract, was and apparently still is of the opinion that the Contractor properly performed within the contract specifications. Obviously both the Contractor and the State were in accord as to the interpretation and meaning of the contract specifications in this instance and they performed according to this interpretation and understanding.

If the State continues to operate under a contract consisting of about 400 pages and by which it retains the complete control of performance by the Contractor, it would seem advisable that at least all its project engineers and chief inspectors understand and interpret the contract and its almost endless provisions as the State would have them understood and interpreted.

It follows from what has been said that the judgment must be reversed and the trial court directed to enter judgment for the Contractor in the amount of $62,630.93, together with interest thereon at the rate of 6% per annum from October 16, 1969.

It is so ordered.

COMPTON, C. J., and McMANUS, J., concur.