568 P.2d 246

**Edith RALEY, Plaintiff-Appellant,**

v.

**MILK PRODUCERS, INC.,
Defendant-Appellee.**

**No. 2796.**

Court of Appeals of New Mexico.

July 26, 1977.

Writ of Certiorari Denied Aug. 23, 1977.

Anthony F. Avallone, Las Cruces, for appellant.

H. John Underwood, Bivins, Weinbrenner & Regan, P. A., Las Cruces, for appellee.

## OPINION

LOPEZ, Judge.

This appeal arose out of a complaint filed in the District Court of Dona Ana County. The complaint presented a cause of action for conversion of milk and proceeds in the amount of $16,000.00. Summary judgment was requested by both parties and the court granted summary judgment in favor of the defendant; accordingly, the court dismissed the plaintiff's complaint. The plaintiff appeals and we affirm.

The plaintiff presents two points: (1) the uncontradicted evidence showed that the defendant converted money proceeds from the sale of milk in which the plaintiff had a security interest; (2) if the defendant could use the defenses of waiver or estoppel, the defenses would raise genuine issues of fact which would preclude summary judgment. The defendant raises three defenses: (1) the authorization to sell the collateral extinguished any· security interest in the proceeds; (2) there was no binding assignment of the milk proceeds; and (3) once the plaintiff exercised her right of repossession under the conditional sales contract the underlying indebtedness was extinguished.

We will discuss the defendant's points seriatim. All statutory references are to the Uniform Commercial Code, Chapter 50A, N.M.S.A.1953 (Repl. Vol. 8, pt. 1, 1962).

Three entities are involved: the plaintiff (the secured party), J. L. and Grace Nicholas (the debtors), and the defendant (the selling agent). Only the secured party and the selling agent are parties to this action.

On September 1, 1970, the secured party and the debtors executed a conditional sales contract for the sale of cattle and dairy equipment at a price of $59,180.00 plus nine percent interest. (This will be referred to as the security agreement). The security agreement provided, among other things, that one installment of $1,000.00 was payable on September 20, 1970, and another such installment was payable on October 20, 1970. Monthly installment payments of $2,000.00 were to commence on November 20, 1970 and continue until the debt was paid.

The security agreement also provided that the secured party would have a lien against all milk produced from the cows. The debtors assigned all of their right, title and interest in such milk to the secured party and agreed to sell all milk produced by the cows through the defendant. The defendant is a marketing or selling agent for various milk producers, retaining only a percentage of the proceeds for services rendered as a selling agent. The security agreement authorized the selling agent to pay the secured party, from the proceeds of the milk sold by the agent, $1,000.00 on September 20, 1970, $1,000.00, on October 20, 1970, and $2,000.00 on the 20th of each month thereafter until the $59,180.00 plus interest was paid. Although the security agreement executed by the secured party and the debtors mentioned the selling agent, the agent was not a party to this contract.

The secured party filed a financing statement in Valencia County where the debtors had their operations.

On September 3, 1970, the secured party's attorney sent a copy of the security agreement to the selling agent. Included was a request that the agent honor the terms of the security agreement. On October 27th of that year a follow-up letter was written by the attorney indicating that no response had been made by the selling agent. This letter did request a "consignment" form which is, presumably, a request for an assignment form.

On October 2, 1970, the selling agent signed an agreement with the debtors which provided, in essence, that the debtors would deliver all milk production to the selling agent who would handle the marketing and selling of the milk.

The selling agent signed a written assignment on October 23, 1970, which provided that effective November 15, 1970, the selling agent was authorized to deduct from the milk proceeds the sum of $1,000.00 per month for payment to the secured party. On record, no reason is given to explain why the amount authorized to be deducted from the debtors' proceeds was only $1,000.00 when the security agreement called for a payment of $2,000.00. Nevertheless the selling agent consented to and agreed to honor the written assignment.

The selling agent later notified the secured party that the authorization to pay contained in the security agreement was not acceptable as an assignment of proceeds. On November 19, 1970, Mrs. Raley, the secured party, received a direct response from the selling agent. This letter acknowledged the receipt of the September 3rd letter from the secured party's attorney along with a copy of the security agreement. Cited was 7 C.F.R. § 1138.80 (1970), which regulates the sale of milk in the Rio Grande Valley marketing area. This federal regulation, in effect at the time, permitted a selling agent (handler) to deduct from a producer's check only "proper deductions *authorized in writing by such producer*" (Emphasis added). The selling agent indicated a willingness to accept an assignment of milk proceeds payable to its members, but the agent would acknowledge and accept only those assignments made on the forms provided by the agent. The agent stated that the security agreement was not acceptable and specifically denied being bound by it.

Finally, the letter acknowledged receipt of an assignment for $1,000.00 per month effective November 15, 1970. Although it recognized that the security agreement called for different terms, the selling agent reiterated its policy that it could not guarantee payment of any assignment and disputes had to be settled between assignor and assignee. Enclosed were blank forms and a suggestion that the secured party, Mrs. Raley, reach an agreement with the debtors and memorialize such an agreement on forms acceptable to the agent.

The secured party never complied with the selling agent's request but the selling agent gave and the secured party accepted $1,000.00 for about twelve months, these payments being $1,000.00 less than the sum called for in the security agreement.

The debtors never made the first two payments called for in the security agree-

ment, and the only evidence of payments which were made indicate that the money came from the selling agent. After twelve months the secured party exercised her rights under the security agreement (the conditional sales contract) and repossessed the cows from the debtors. The secured party did not sue for a deficiency nor did she take any action against the debtors. Later, the secured party filed this suit against the selling agent.

*Status of a Security Interest with Authorization to Sell—Waiver*

The secured party argues that the evidence is clear and uncontroverted that the selling agent converted cash proceeds from the sale of milk. The secured party argues that when the marketing agent paid only $1,000.00 and did not pay the $2,000.00 as was stated in the security agreement, the selling agent converted the deficiency of $1,000.00. Although it is unclear from the complaint, it appears that the secured party asserts that the selling agent is also liable for the other payments which the debtors missed.

The secured party relies upon the security agreement, financing statement, and §§ 50A–9–306, 307. The secured party argues that § 50A–9–306 continues the security interest in identifiable proceeds, and that the money received by the selling agent for the sale of milk produced and delivered by the debtors was subject to the secured party's interest. We must keep in mind that there was no agreement between the secured party and the selling agent other than the acceptance of an assignment of $1,000.00 per month. Section 50A–9–306 states:

"*50A–9–306. 'Proceeds'—Secured party's rights on disposition of collateral.* —(1) 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds.' All other proceeds are 'non-cash proceeds.'

"(2) Except where this article otherwise provides, *a security interest continues in collateral notwithstanding sale*, exchange or other disposition thereof by the debtor *unless his action was authorized by the secured party in the security agreement or otherwise*, and also continues in any identifiable proceeds, including collections, received by the debtor. A security interest in farm products and the proceeds thereof shall not be considered waived by the secured party by any course of dealing between the parties or by any trade usage.

"(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten [10] days after receipt of the proceeds by the debtor *unless*:

"(a) *a filed financing statement covering the original collateral also covers proceeds*; . . . ." [Emphasis added].

It is undisputed that the goods involved in this case are "farm products." Section 50A–9–109(3). Products of livestock, such as milk, are included in the definition of "farm products". Section 50A–9–109(3).

In the case of *S & W Trucks, Inc. v. Nelson Auction Service Inc.*, 80 N.M. 423, 457 P.2d 220 (Ct.App.1969), this Court seemed to agree with a district court decision that the consent to the sale of collateral waived any interest the secured party had in the collateral, at least for the purpose of the sale. In *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967), the court said:

"When plaintiff [the secured party] consented to the sales and the collection of the proceeds of sales by [the debtor], [the secured party] lost its security interest in the collateral and was then looking to [the debtor] personally for payment."

We believe that under the Uniform Commercial Code, § 50A–9–306, and the law as stated in *Clovis National Bank*, the authorization for the sale of products contained in the security agreement waived

any interest the secured party had in proceeds of the collateral. See *Swift & Company v. Jamestown Nat. Bank*, 426 F.2d 1099 (8th Cir. 1970).

Otherwise the *Clovis National Bank* case is inapposite. The security agreement involved in *Clovis* expressly provided that the debtor was not to sell or otherwise dispose of the collateral without the written consent of the secured party. In *Clovis* the court nevertheless implied a consent or authorization to sell, *implied* from course of dealing and trade usage. See, e. g., *Planters Production Credit Association v. Bowles*, 256 Ark. 1063, 511 S.W.2d 645 (1974). In the case *sub judice* we have an *express* authorization to sell. Although the secured party in this case argues that she never consented to a sale of the milk, the evidence is overwhelmingly against this contention. The security agreement expressly authorized the sale of milk to the selling agent, and the secured party herself testified that she knew that the debtors would have to sell the milk in order to live.

The correct procedure which the secured party should have followed would have been to have the debtors' accounts covered by the security agreement, accompanied by a financing statement filed in the proper place covering these accounts. As stated in Coogan, Hogan, Vagts, Secured Transactions Under the Uniform Commercial Code, § 27.03[3] (1963):

"...  On the other hand it seems less likely that a lender who takes a security interest in chickens or dairy cattle would expect to include products since the products of chickens and dairy cattle (eggs and milk) are marketed on a daily or at least a weekly basis. If milk and eggs are used as collateral it would seem that permission to sell would be a necessary condition of the agreement because the farmer does not normally have adequate storage for such perishable products. There is no precedent in pre-Code farm law for a security interest in milk or eggs while such goods remain in the possession of the farmer. Conceivably the Code can be adapted directly to this type of collateral but it would seem more appropriate to use account financing when the principal products of the farm debtor is milk or eggs. There is some precedent for this type of financing."

Under the discussion of the milk check assignment, § 27.04[2], it is said:

"It was observed earlier that milk as a product of livestock would probably not be considered appropriate collateral for a farm loan. Under the Code however the delivery of milk creates an account. Whenever the farmer delivers milk to the purchaser a right to payment for goods sold arises and this can be the subject of a security agreement. The agreement can include future accounts arising from future milk deliveries.

"The security interest is valid without an acceptance by the milk purchaser. ..."

The secured party relies heavily on *Baker Production Credit Association v. Long Creek Meat Company, Inc.*, 266 Or. 643, 513 P.2d 1129 (1973). The case is distinguishable because the security agreement involved therein provided that the debtor was not to sell or otherwise dispose of any of the collateral without the consent of the secured party.

*Assignment of Proceeds*

█ The only notice of assignment which the selling agent received was the authorization from the debtors to pay the secured party $1,000.00 per month. This was the only assignment which the selling agent accepted and agreed to under § 50A–9–318(3). We believe that if the assignment is of an entire claim, the consent of the debtor is not required. Assignments, 6 Am.Jur.2d § 100 (1963). But we also believe that under § 50A–9–318(3) the selling agent had a right to make the reasonable request that the secured party provide proof the assignment had been made. This is especially true if only a partial assignment has been made. The defendant requested proof and the plaintiff never complied with the request; therefore, no assignment was made.

The instant case presents a set of facts analogous to *S & W Trucks, Inc. v. Nelson Auction Service, Inc.,* supra. Although the language of an assignment can be informal or in writing, at least it must show an intent to transfer on the part of the assignor. In our opinion, the security agreement was a mere authorization for the selling agent to make particular payments. In the absence of an assignment, however, the selling agent's liability extended only to the debtors and the distribution of the proceeds was made at their direction. *S & W Trucks, Inc. v. Nelson Auction Service, Inc.,* supra.

### Effect of Rescission and Repossession

█ Upon default the secured party terminated the contract and repossessed the cows. See §§ 50A–9–504, 505 and 507. She did not sue the debtors for deficiency. Now the secured party is attempting to sue the defendant for conversion.

It is the function of the courts to interpret and enforce contracts as made by the parties. *Woods v. Collins,* 87 N.M. 370, 533 P.2d 759 (Ct.App.1975). The primary objective in construing a contract is to ascertain the intent of the parties. *Schultz & Lindsay Construction Co. v. State,* 83 N.M. 534, 494 P.2d 612 (1972).

The contract in this case had a forfeiture clause:

"It is agreed that if the monthly installment payments or any one of them be delinquent or unpaid on the date same should be paid or if default be made by the buyers in any of the conditions contained in this contract and they shall remain in default in any such respects for a period of fifteen (15) days after written notice of such default has been mailed to them at Route 1, Box 356 in Belen, New Mexico, the seller shall, at her option, have the right to cancel and terminate this contract and terminate the buyers' right to possession of the above described property and all sums paid hereunder shall be considered forfeited as rental and liquidated damages, and the seller shall have the right to take immediate posses-sion of the property, with or without process of law and failure on the part of the buyers to surrender possession upon demand, shall render buyers guilty of unlawful detainer. The seller may, however, at her option in lieu of cancelling this contract, take such other steps at law or equity which she is allowed to take to enforce the provisions hereof. . . ."

The intention of the parties appears to be that the secured party could exercise an option to terminate the contract and declare a forfeiture if the debtors defaulted. This is what the secured party did. The secured party having declared a forfeiture, and having elected to rescind the contract, it follows as a matter of law that there can be no recovery of any amount the selling agent might have owed. The rescission and termination of the contract destroyed the consideration for any agreement between the debtors and the secured party. Assuming, arguendo, that there was an agreement of some kind between the selling agent and the secured party, the rescission of the contract destroyed that agreement. *Davies v. Boyd,* 73 N.M. 85, 385 P.2d 950 (1963).

We believe that the court was correct in granting a summary judgment in favor of the defendant. See *Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972); *Withrow v. Woozencraft,* 90 N.M. 48, 559 P.2d 425 (Ct. App.1977); *First National Bank v. Nor-Am Agricultural Products, Inc.,* 88 N.M. 74, 537 P.2d 682 (Ct.App.1975).

Summary judgment is affirmed.

IT IS SO ORDERED.

SUTIN, J., specially concurs.

EDMUND H. KASE, III, District Judge, specially concurs.

SUTIN, Judge (specially concurring).

I concur in the result.

Plaintiff appeals the summary judgment granted in favor of the defendant.

Plaintiff sold cattle and dairy equipment to J. L. and Grace Nicholas (Nicholas) for which payments were to be made by monthly installments of $2,000 following two ini-

tial payments of $1,000 each. Plaintiff retained a lien on all milk produced by the cows. Plaintiff perfected her security interest in the collateral and proceeds by filing a financing statement in Valencia County, the county in which Nicholas operated their business. See §§ 50A–9–302, 303, 401 and 402, N.M.S.A. 1953 (Repl.Vol. 8, pt. 1, 1962 and 1975 Supp.).

Nicholas agreed to sell all milk produced through defendant, Milk Producers, Inc. [later, Associated Milk Producers, Inc.], a milk marketing association. Further, Nicholas authorized defendant, from the proceeds realized by the sale of the milk, to pay the monthly installments directly to plaintiff in accordance with the terms specified in the contract.

Plaintiff sued defendant and alleged that pursuant to these terms she was entitled to payments totaling $30,000 from the defendant; that she received only $14,000; that defendant's failure to remit the full amount constituted a conversion of the proceeds; and that she is entitled to judgment for $16,000.

A. *Plaintiff Waived Security Interest in the Proceeds*

Plaintiff insists that the conditional sales agreement, which, coincidentally served additionally as security agreement, § 50A–9–201, and financing statement, § 50A–9–402 (1975 Supp.), continued her security interest in all proceeds from the cows, including milk and cash receipts for the sale of the milk.

Section 50A–9–306(2) (1975 Supp.) governs:

Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds, including collections, received by the debtor. *A security interest in farm products and the proceeds thereof shall not be considered waived by the secured party by any*

*course of dealing between the parties or by any trade usage.* [Emphasis added.]

The italicized portion signals an amendment enacted by Laws 1968, ch. 12, § 2. Its intendment was to overcome an earlier judicial construction of this subsection.

*Clovis National Bank v. Thomas, supra,* had held that a debtor's sale of farm products authorized either expressly or impliedly according to trade usage or custom by the secured party extinguished the secured party's interest in the collateral.

The 1968 amendment provided that only an expressly authorized sale would discontinue the security interest. Otherwise, *Clovis* was left intact.

The only other New Mexico case to consider this issue was *S & W Trucks, Inc. v. Nelson Auction Service, Inc., supra.* Decided in 1969, subsequent to the amendment's enactment, it stated:

It is undisputed that the consent on the part of S & W and Chicago to the auction sale had the effect of waiving their liens upon the rigs and related property, at least for the purpose of the sale. *Clovis National Bank v. Thomas* . . . . . [80 N.M. at 424, 457 P.2d at 221].

The only material issue is whether or not plaintiff expressly authorized Nicholas to sell the milk. According to the sales contract, the parties agreed that the Nicholas will sell all milk produced . . . through Milk Producers, Inc. . . . Neither obfuscation nor sophistry disguises the nature of this term: an express authorization to sell the milk through defendant. The sale having been expressly authorized, seller's security interest was waived, § 50A–9–306(2); see Official Comment No. 3, § 9–306 and Official Comment No. 2, § 9–307.

Plaintiff argues that the New Mexico cases do not control, that the Oregon case of *Baker Production Credit Association v. Long Creek Meat Company, Inc., supra,* speaks more authoritatively. I would distinguish that case, not because, as the majority suggests, the security agreement prohibited sale of the collateral without con-

sent, but rather, because the consent given was conditional and the condition had not been met. In our case, consent to sale was also made conditional by the terms of the conditional sales contract; however, in our case, the conditions were satisfied.

The majority offers the "correct procedure" to preserve the seller's security interest: simply include "accounts" in the security agreement. I do not join in this advice for two reasons:

(1) Included among the meanings of "proceeds" is "account," § 50A–9–306(1). Because plaintiff's agreement accorded her a security interest in "proceeds," she necessarily obtained a security interest in the "accounts." The majority's advice, therefore, would perform a superfluous exercise.

(2) When the debtor defaults, § 50A–9–502(1) entitles the secured party to "notify an account debtor . . . to make payment to him . . . and also to take control of any proceeds to which he is entitled under section 9–306." An "account debtor" is one obligated on an account, § 50A–9–105(a). An "account" is a right to payment, § 50A–9–106. The evidence before us shows that the defendant remitted, either to the plaintiff or Nicholas, all the money due. Because defendant discharged its obligation, it was not an account debtor. The plaintiff, therefore, could not gain any additional advantage over the defendant by attempting to designate it an account debtor, the definitional requirements of which were not fulfilled.

B. *Assignment of proceeds to plaintiff was lost by Nicholas' assignment to defendant*

The majority holds that the conditional sales agreement was ineffective to create a valid assignment. The pertinent provision in the agreement reads:

. . . buyers do hereby authorize Milk Producers, Inc. to pay to the seller, from the proceeds of the milk sold to M.P.I., . . . ($1,000.00) . . . on or before September 20, 1970, and . . . ($1,000.00) . . . on or before October 20, 1970, and . . .

($2,000.00) . . . on or before the 20th day of each month thereafter until . . . ($59,180.00) . . . plus interest, have been paid in full.

The document in its entirety was delivered to the defendant along with a cover letter drafted by plaintiff's attorney. The letter included the following explanation:

By the Contract of Sale, the buyers have assigned unto Mrs. Raley as security for the payment of the consideration named in the contract, their interest in the milk produced by such cows, and Mrs. Raley has a lien against such milk securing the payment of the amount due her under the contract. By the terms of the contract, you are to mail to Mrs. Raley, on the 20th day of September, $1,000 and on the 20th day of October, $1,000 and on the 20th day of each month thereafter until the consideration and interest are paid, $2,000, from the proceeds of the sale of the milk belonging to the buyers.

Although I agree with the majority that New Mexico's law on assignments under the U.C.C. is adequately contained in *S & W Trucks, Inc., supra,* I do not agree with the majority's recitation of the law, nor do I agree that the facts are analogous.

(a) The Law

The Uniform Commercial Code, § 50A–9–318(3), N.M.S.A. 1953, provides, with respect to a notification to an account debtor of the assignment of the account, that a notification which does not reasonably identify the rights assigned is ineffective. [*S & W Trucks,* 80 N.M. at 425, 457 P.2d at 222].

Section 50A–9–318(3) also provides:

If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

(b) The Facts

In *S & W Trucks, Inc.* the secured party consented to debtor's sale through the defendant auction house. The debtor there-

upon sent two letters to the auctioneer authorizing it to pay a given amount to S & W. These letters did not create an assignment because they did "not identify any rights or claimed rights of S & W and Chicago in any of the funds derived from sale." [80 N.M. at 425, 457 P.2d at 222].

In our case, as noted above, the documents received by the defendant clearly identified all "the rights or claimed rights [of plaintiff] in . . . the funds derived from sale." This measure of proof does not satisfy the majority, but I can think of no more probative evidence of an assignment than a duly executed agreement ratified, in effect, by the secured party's own lawyer.

This assignment, however, insofar as it determined defendant's obligations to plaintiff, as assignee, was superceded by the subsequent assignment executed by Nicholas and defendant. By its terms, defendant was to pay to plaintiff $1,000 each month rather than the $2,000 provided by the conditional sales agreement. The variance, to me, is prima facie evidence of fraud by Nicholas, but absent any showing of collusive participation or unlawful purpose by defendant (and no such allegation was made), it may lawfully assert the terms of the assignment to which it was privy. This assignment subjugated plaintiff's rights. Section 50A–9–318 reads:

(1) . . . the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; . . . . .

Based on the foregoing analysis, the assignment obligated defendant to pay $1,000 to plaintiff. The defendant fulfilled its obligation.

### C. *Effect of Rescission and Repossession*

Let me note at the outset as an aside, that the plaintiff chose not to join Nicholas as defendants because plaintiff fully exercised her contractual remedies by retaining all monies paid and by repossessing the cows. The majority was puzzled why Nicholas was not made a party to the action.

The majority holds under this point that plaintiff relinquished all rights against Nicholas when she exercised her contractual rights against Nicholas. I would not reach this issue because the first two points, supra, dispose of the matter, and the issue presented has not been adequately joined for review.

I should like simply to respond to the majority's reasoning.

(1) The majority would enable the defendant to assert contractual defenses to which it was not a party. At the same time the majority vouchsafes the defendant from any contractual obligations. In other words, defendant gains whatever third party benefits may be forthcoming, but it escapes any duty. This seems inequitable on its face.

(2) The Uniform Commercial Code does not have a provision which resolves this contention. Section 50A–9–318 discusses the defenses available to defendant, an account debtor, against plaintiff, an assignee. This section does not say that defendant enjoys all the defenses against plaintiff that Nicholas might have. In other words, the statute does not allow defendant to fill the shoes of Nicholas whenever it suits defendant.

(3) If defendant converted the proceeds, the tort occurred at the moment defendant exercised unlawful dominion over the property; to await plaintiff's decision as to how it will enforce its contractual rights against Nicholas as determinative of whether or not conversion will lie, delays, in effect, the accrual of the cause of action until long after the tortious conduct was committed. Put more simply: plaintiff alleges that defendant converted the November, 1969 proceeds when it remitted $1,000 instead of $2,000; defendant answers that because over a year later plaintiff repossessed the cows from Nicholas that it could not have committed any tort.

(4) *Davies v. Boyd, supra,* cited by the majority cannot serve as authority for a rule that the rescission of a contract be-

tween X and Y terminates all rights that X may have against Z. In *Davies v. Boyd*, the court had before it a purchaser and seller of a home under a real estate contract. The contract provided that upon default by the buyer, the seller could cancel the contract and retain all amounts already paid. The Court ruled that once the seller exercised these rights, it could not enforce a note executed by the buyer as part of the purchase agreement. This case has no value as precedent for the rights which may be invoked against a third party.

EDMUND H. KASE, III, District Judge (specially concurring).

I concur in the result. I also concur in the opinion, except that:

1. I do not join in the obiter dictum under the first point of the decision as to the procedure which the secured party should have followed to preserve her security interest. It is unnecessary and at best advisory.

2. I do not join in the holding under the third point of the decision to the effect that the secured party's rescission and termination of her contract with the debtors bars recovery in this case. I would not reach this issue because the first two points of the decision adequately dispose of this case.